CARL E. STEWART, Circuit Judge:
We took this case en banc to reconsider the issue of whether the qui tam provisions of the False Claims Act (“FCA”), which permits private citizens, or relators, to pursue actions for fraudulent claims in the name of the federal government, violate the constitutional separation of powers doctrine under the Take Care and Appointments Clauses of Article II. Because we find no such unconstitutional intrusion, we reverse and remand to the district court.
FACTUAL AND PROCEDURAL HISTORY
Joyce Riley (“Riley”), a former nurse at St. Luke’s Episcopal Hospital (“St. Luke’s”), sued eight defendants under the qui tam provisions of the FCA, claiming that they defrauded and conspired to defraud the United States Treasury in violation of the statute. Riley proceeded with the lawsuit although the government exercised its right not to intervene under 31 U.S.C. § 3730(b)(4)(B) (2000).[1] The district court subsequently dismissed Riley’s lawsuit on standing grounds.[2] On appeal, *752 however, this Court held that although Riley had standing to sue under Article III,[3] qui tam actions pursued under the FCA in which the government does not intervene violate the doctrine of separation of powers and the Take Care Clause.
The United States intervened to defend the constitutionality of the FCA. We subsequently decided to rehear this case en banc, but delayed it pending the Supreme Court’s decision in Stevens,[4]
DISCUSSION
I. The Role of History
Qui tam lawsuits have been used throughout American and English history as a means to discover and to prosecute fraud against the national treasuries. Indeed, the Founding Fathers and the First Congress enacted a number of statutes authorizing qui tam actions. Stevens, 529 U.S. at 793-96 nn.5-7, 120 S.Ct. 1858. After undergoing a decline in popularity and need, qui tam, under the guise of the original FCA, enjoyed a renaissance during the Civil War era. This renaissance was precipitated by a desire to combat widespread corruption and fraud amongst defense contractors who supplied the Union Army. Stevens, 529 U.S. at 792, 120 S.Ct. 1858.
In 1986, qui tam underwent a similar surge of popularity after Congress’s decision to amend the FCA in order to promote such lawsuits in the face of an ever-growing federal deficit and fears that defense contractors were once again defrauding the government. The most important amendment that Congress made to the 1986 legislation was to increase the reward offered to qui tam plaintiffs. J. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Legislation, 78 N.C. L. REV. 539, 541-42 (2000). The increase in the proceeds available to rela-tors has resulted in an augmented number of lawsuits filed by qui tam relators. Id. at 542. As of September 1999, more than 2900 qui tam lawsuits had been filed. Id. Moreover, more than a billion dollars have been recovered under the FCA qui tam provisions since 1987. Anna Mae Walsh Burke, Qui Tam: Blowing the Whistle for Uncle Sam, 21 Nova L. Rev. 869, 871 (1997).
The practical effects of the 1986 amendments to the FCA notwithstanding, the Supreme Court in Stevens gave due credence to the important historical role that qui tam lawsuits have played on both sides of the Atlantic as a means to root out corruption against national governments. Justice Scalia, writing for the 7-2 majority in Stevens, noted that the history of qui tam was “well nigh conclusive” with respect to resolving the question of whether qui tam relators fihng suit under the FCA have Article III standing. Stevens, 529 U.S. at 792, 120 S.Ct. 1858.
Although the Court in Stevens expressed no opinion regarding the role of history in evaluating the Article II Take Care and Appointments Clauses questions, we are persuaded that it is logically inescapable that the same history that was conclusive on the Article III question in Stevens with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute. Indeed, the dissent in Stevens noted that history alone *753 resolves the question of whether the qui tam provisions in the FCA violate Article II, stating “[t]hat [historical] evidence, together with the evidence that private prosecutions were commonplace in the 19th century ... is also sufficient to resolve the Article II question that the Court has introduced sua sponte, ante, at 1865, n. 8.” Stevens, 529 U.S. at 801, 120 S.Ct. 1858. (Stevens, J., dissenting). Therefore, we find that history, although not the sole definitive argument supporting the view that the FCA’s qui tam provisions do not violate Article II, is certainly a “touchstone illuminating” their constitutionality. Riley, 196 F.3d at 543-44 (Stewart, J., dissenting). Moreover, this historical perspective provides us with a helpful bridge into the workings of the statute itself.
II. The Executive’s Control Over Qui Tam Actions Initiated Under the FCA
That a private citizen may pursue qui tam litigation under the FCA, whether the government chooses to intervene or does not choose, does not interfere with the President’s constitutionally assigned functions under Article II’s Take Care Clause. Although the Clause states that the Executive must “take Care that the Laws be faithfully executed,” it does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law. U.S. Const, art. II, § 3. Thus, even though Congress has historically allowed alternative mechanisms of fraud enforcement against the federal government, this state of affairs does not therefore mean that the Executive’s functions to control such litigation are necessarily impinged.
As this Court has previously noted, the Executive retains significant control over litigation pursued under the FCA by a qui tam relator. First, there is little doubt that the Executive retains such control when it intervenes in an action initiated by a relator.[5] Second, even in cases where the government does not intervene, there are a number of control mechanisms present in the qui tam provisions of the FCA so that the Executive nonetheless retains a significant amount of control over the litigation. The record before us is devoid of any showing that the government’s ability to exercise its authority has been thwarted in cases where it was not an intervenor.
Our precedent, moreover, accords with the position that this en banc court now takes. In Searcy v. Philips Electronics N. Am. Corp., et al., 117 F.3d 154 (5th Cir.1997), we held that the FCA clearly permits the government to veto settlements by a qui tam plaintiff even when it remains passive in the litigation. We cited several ways in which the government may assume control over qui tam litigation in which it does not intervene under the FCA. See id., 117 F.3d at 160. We noted that not only may the government take over a case within 60 days of notification, but it may also intervene at a date beyond the 60-day period upon a showing of good cause. Id., 117 F.3d at 159 (citing 31 U.S.C. § 3730(d)(2)(A) and 31 U.S.C. §§ 3730(b)(3) & (c)(3)). This Court also stated that the government retains the unilateral power to dismiss an action “notwithstanding the objections of the person.” Id., 117 F.3d at 160 (citing 31 U.S.C. § 3730(c)(2)(A)).
In United States ex rel. Russell v. Epic Healthcare Mgmt. Group, we held that parties, in a qui tam suit filed under the FCA in which the United States does not intervene, have 60 days to file a notice of *754 appeal under Rule 4(a)(1) of the Federal Rules of Civil Procedure.[6] 193 F.3d 304, 306 (5th Cir.1999). We similarly stated in Russell that although the government does not intervene, its involvement in the litigation nonetheless continues. Id. We noted, for example, that, in addition to the control mechanisms already stated in Searcy, the government “may request that it be served with copies of pleadings and be sent deposition transcripts ... [and it] may pursue alternative remedies, such. as administrative proceedings.” Id. at 307; see also 31 U.S.C. § 3730(c)(3) and (5). We also noted that despite the government’s non-intervention, it “receives the larger share of any recovery,” amounting to up to 70% of the proceeds of a lawsuit.[7] Id.; see also 31 U.S.C. § 3730(d)(1) and (2).
Furthermore, the FCA itself describes several additional ways in which the United States retains control over a lawsuit filed by a qui tam plaintiff. In the area of settlement, for example, the government may settle a case over a relator’s objections if the relator receives notice and hearing of the settlement. 31 U.S.C. § 3730(c)(2)(B). Additionally, in the area of discovery, if the government shows that discovery initiated by a qui tam plaintiff “would interfere with the Government’s investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay the discovery for sixty days or more,” whether or not the government intervenes. 31 U.S.C. § 3730(c)(4).
For this reason, it is therefore apparent that the Supreme Court’s decision in Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), the primary case upon which the Riley panel majority relied to analyze the constitutionality of the qui tam provisions of the FCA under Article II,[8] is inapplicable to the present discussion. At issue in Morrison were the independent counsel provisions of the Ethics in Government Act (“EGA”), which permitted the delegation of “criminal prosecution functions to a judicially appointed *755 prosecutor who could be removed only by the Attorney General, and only under a highly constrained ‘good cause’ requirement.” Returning Separation-of-Powers Analysis to Its Normative Roots: The Constitutionality of Qui Tam Actions and Other Private Suits to Enforce Civil Fines, 30 Envtl. L. Rep. (Envtl.L.Inst.) 11,081, at 11, 095 (Dec.2000) [hereinafter Returning Separation^of-Powers ]. The Morrison Court upheld the independent counsel provisions, finding that they do not violate separation of powers principles by impermissibly infringing upon the Executive’s constitutional duties under either the Take Care Clause or the Appointments Clause of Article II. Morrison, 487 U.S. at 696, 108 S.Ct. 2597.
Morrison, although it examined similar constitutional questions with regard to the Executive’s duties under Article II, is not relevant to the present discussion of qui tam relators, which invokes civil suits filed by private plaintiffs, for two principal reasons. First, the EGA assigns the independent counsel to act as the United States itself, in contrast to the FCA’s qui tam provisions, which only authorize the relator to bring a lawsuit in the name of the United States. 28 U.S.C. § 594(a) (2000), expired by 28 U.S.C. § 599 (authorizing the independent counsel to have “full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice”); see also 28 U.S.C. § 594(i), expired by 28 U.S.C. § 599 (noting that the independent counsel and persons appointed by that independent counsel “are separate from and independent of the Department of Justice”); 28 U.S.C. § 597(a), expired by 28 U.S.C. § 599 (stating that when an independent counsel has undertaken its duty to investigate and to prosecute “the Department of Justice, the Attorney General, and all other officers and employees of the Department of Justice shall suspend all investigations and proceedings regarding such matter, except to the extent required by section 594(d)(1) [28 USCS [sic] §§ 594(d)(1) ], and except insofar as such independent counsel agrees in writing that such investigation or proceedings may be continued by the Department of Justice”).
Second, in contrast to independent counsel who undertake functions relevant to a criminal prosecution, relators are simply civil litigants. No function cuts more to the heart of the Executive’s constitutional duty to take care that the laws are faithfully executed than criminal prosecution. Since the advent of public prosecutions in the United States, “no private citizen ... can subject another private citizen to the unique and virtually unfettered powers of a criminal prosecutor .... The burdens of criminal investigation cannot be imposed on any target unless the investigator has been duly clothed with the power of the state through a process that is legally and politically accountable.” Returning Separation-of-Powers, at 11, 097. Thus, because the independent counsel provisions at issue in Morrison and the qui tam provisions central to Riley involve two different types of lawsuits, the Executive must wield two different types of control in order to ensure that its constitutional duties under Article II are not impinged. Should the occasion arise, these two different types of control necessarily require the application of two different sorts of tests. Hence, the Morrison control test that the panel majority used to evaluate the constitutionality of the qui tam provisions in the FCA is simply not dispositive of the instant case, as it involves an entirely different lawsuit and requires entirely different control mechanisms.[9]
*756 There is also a credible argument that because the Court upheld the EGA’s independent counsel provisions under Article II, it would similarly uphold the FCA’s qui tam provisions under the same Article. Relators sue in civil capacities, involving lesser uses of traditional Executive power, in contrast to independent counsels who arguably wield greater “Executive” power because they act in criminal contexts.[10]
Moreover, the powers of a qui tam relator to interfere in the Executive’s overarching power to prosecute and to control litigation are seen to be slim indeed when the qui tam provisions of the FCA are examined in the broad scheme of the American judicial system. The prosecution of criminal cases has historically lain close to the core of the Article II executive function. The Executive Branch has extraordinarily wide discretion in deciding whether to prosecute. Indeed, that discretion is checked only by other constitutional provisions such as the prohibition against racial discrimination and a narrow doctrine of selective prosecution. Nonetheless, when the Executive has made the decision to initiate the criminal case, its large discretion is narrowed considerably and the power to dispose of the case is shared in part with the Third Branch.
For example, Rule 48(a) of the Federal Rules of Criminal Procedure clearly states that although the Executive has the power to indict an individual, it may not dismiss such an indictment without “leave of court.” Fed.R.Crim.P. 48(a). Similarly, Rule 11 of the Federal Rules of Criminal Procedure requires court approval of plea bargains, a judicial check that functions in *757 a manner similar to that of Rule 48. Fed.R.CRIM.P. 11(a)(2).[11]
Thus, although our judicial system allows for these seemingly greater intrusions by the Judiciary into the Executive’s paramount power to prosecute in the criminal context, Rule 48, Rule 11, and the criminal justice system have not suffered from the constitutional and systemic pitfalls that have been ascribed to the FCA’s qui tam provisions. See, e.g., United States v. Cowan, 524 F.2d 504, 513 (5th Cir.1975) (stating that “the phrase ‘by leave of court’ in Rule 48(a) was intended to modify and condition the absolute power of the Executive, consistently with the Framer’s concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives”). Any intrusion by the qui tam relator in the Executive’s Article II power is comparatively modest, especially given the control mechanisms inherent in the FCA to mitigate such an intrusion and the civil context in which qui tam suits are pursued. Hence, the qui tam portions of the FCA do not violate the constitutional doctrine of separation of powers by impinging upon the Executive’s constitutional duty to take care that the laws are faithfully executed under Article II of the Constitution.[12]
III. The FCA’s Qui Tam Provisions do not Violate the Appointments Clause
The Appointments Clause states in part that “the President shall nominate, and by and with the advice and consent of the Senate shall appoint ... all other officers of the United States, whose appointments are not herein otherwise provided for and which shall be established by law. But the Congress may, by law, vest the appointment of such inferior officers as they may think proper ... in the heads of departments.” U.S. Const, art. II, § 2, cl. 2. The district court and the panel majority in Riley declined to address this question, but it is presented to us en banc because it was raised in the district court as an additional basis for finding constitutional deficiency in the qui tam provisions of the FCA. We are persuaded that this argument holds even less vitality than the arguments made about the Take Care Clause, given that qui tam relators are not officers of the United States.
Supreme Court precedent has established that the constitutional definition of an “officer” encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government. See Auffmordt v. Hedden, 137 U.S. 310, 327, 11 S.Ct. 103, 34 L.Ed. 674 (1890) (finding that a merchant appraiser is not an “officer” for purposes of the Appointments Clause where his position is without tenure, duration, continuing emolument, or continuous duties); United States v. Germaine, 99 U.S. 508, 511-12, 25 L.Ed. 482 (1878) (holding that a surgeon appointed by Commissioner of Pensions was not an “officer” where his duties were not continuing and permanent). There is no such relationship with regard to qui tam relators, and they therefore are not subject to either the benefits or the requirements associated with offices of the *758 United States. For instance, qui tam plaintiffs do not draw a government salary and are not required to establish their fitness for public employment.[13] Therefore, we are persuaded that the FCA’s qui tam provisions do not violate the Appointments Clause.
CONCLUSION
For the foregoing reasons, we hold that the qui tam provisions of the False Claims Act do not violate the principle of separation of powers by impermissibly infringing upon the constitutional duty of the Executive to take care that the laws are faithfully executed under the Take Care Clause of Article II. We similarly hold that the FCA’s qui tam provisions do not violate the Appointments Clause. We, therefore, REVERSE and REMAND to the district court for further proceedings.
REVERSED AND REMANDED.

. In exchange, qui tam plaintiffs, such as Riley, may recover up to 30 percent of the proceeds of an action, in addition to reasonable attorneys’ fees and costs, if the action is successful. 31 U.S.C. § 3730(d)(2). Relators, however, may recover a maximum of 25 percent of the proceeds in lawsuits initiated by a relator in which the government chooses to intervene. 31 U.S.C. § 3730(d)(1).

. United States ex rel. Riley v. St. Luke’s Episcopal Hosp., et al., 982 F.Supp. 1261, 1268-69 (S.D.Tex.1997).

. The United States Supreme Court subsequently held that relators have standing to bring qui tam actions under the FCA. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). We, therefore, pretermit discussion of this issue.

. For further examination of the factual and procedural background of this case, see Riley v. St. Luke's Episcopal Hosp., et al., 196 F.3d 514 (5th Cir.1999), vacated by 196 F.3d 561, and United States ex rel. Riley v. St. Luke’s Episcopal Hosp., et al., 982 F.Supp. 1261.

. The panel majority's original holding was limited solely to cases in which the government does not intervene, and it did not address this subset of the qui tam universe. See Riley, 196 F.3d at 529 n. 43.

. We nonetheless affirmed the district court's dismissal of the qui tam suit in Russell because the relator failed to plead fraud with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. Russell, 193 F.3d at 306.

. In United States ex rel. Foulds v. Texas Tech Univ., we also held that the Eleventh Amendment barred a qui tam suit by a private plaintiff against a public university in which the government did not intervene, and we stated that there is a continuum of control that the government has in qui tam lawsuits. 171 F.3d 279, 289-90 (5th Cir.1999), cert. denied, 530 U.S. 1202, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000). On the one hand, the government has complete control when it decides to intervene. Id. On the other hand, although we indicated that a relator has significant control over qui tam litigation when the government chooses not to intervene, we stated that the government still "retains some control over the qui tam suit.” Id. at 289-90, 293. Thus, our holding in Foulds does not contradict our en banc position now.

.The Riley majority gleaned a four-part test from Morrison to determine whether the Executive retains sufficient control and discretion over lawsuits filed by qui tam plaintiffs under the FCA consistent with the Take Care Clause of Article II. This test included the following inquiries: 1) whether the Executive may remove the relatpr for good cause; 2) whether the Executive may request the appointment of the relator; 3) whether the Executive defines the jurisdiction of the relator; and 4) whether the relator must abide by the policies of the Department of Justice. Riley, 196 F.3d at 527-28. The panel majority, however, emphasized the second factor of this Morrison control test by focusing on two elements: 1) the Executive does not have prose-cutorial discretion to prosecute a claim brought by a qui tam plaintiff; and 2) the Executive does not have sufficient control over the litigation if it does not intervene in the litigation once it is commenced. Id. at 528.

. The Ninth Circuit in United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 752 (9th Cir.1993), also used Morrison to examine the *756 question of whether the FCA's qui tam provisions violate separation of powers. In contrast to the Morrison control test used by the panel majority in Riley, however, the Ninth Circuit relied on the independent counsel provisions discussed in Morrison simply as an analogy. For example, it analyzed the qui tam provisions in the FCA only to the extent that they " 'as a whole1 [compared] to the independent counselprovisions ‘as a whole’ ” and whether the FCA "taken as a whole” violates the principle of separation of powers by unduly interfering with the President’s constitutional role. Kelly, 9 F.3d at 752.

. Other circuits have either cited the control mechanisms in the FCA that we now discuss or have already taken the position we now declare en banc. See, e.g., United States v. Health Possibilities, P.S.C., 207 F.3d 335, 340-41 (6th Cir.2000) (holding that the absolute consent of the Attorney General is required before a relator may settle an action under the qui tam provisions of the FCA even when it does not intervene in the action); United States ex rel. Zissler v. Regents of Univ. of Minn., 154 F.3d 870, 872 (8th Cir.1998) (agreeing with other circuit courts that the United States is "the real party in interest” because of its "extensive power” to control the qui tam litigation as well as the "extensive benefit flowing to [it] from any recovery”); United States ex rel. Hall v. Tribal Dev. Corp., 49 F.3d 1208, 1213 (7th Cir.1995) (reiterating that "it is the government, not the individual relator, who is the real plaintiff in the suit”); United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co., 41 F.3d 1032, 1041 (6th Cir.1994) (stating that the FCA’s qui tam provisions "do not contradict the constitutional principle of separation of powers. Rather, they have been crafted with particular care to maintain the primacy of the Executive Branch in prosecuting false-claims action, even when the relator has initiated the process”); Kelly, 9 F.3d at 745 (holding in part that the qui tam provisions of the FCA do not violate the constitutional principle of separation of powers); United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1155 (2d Cir.1993) (stating that "the FCA qui tam provisions do not usurp the executive branch’s litigating function because the statute gives the executive branch substantial control over the litigation”); United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 48-49 (4th Cir.1992) (emphasizing the "extensive power the government has to control [qui tam] litigation” and underscoring that the United States is the "real plaintiff” in a qui tam action filed under the FCA, that it "is entitled to the lion’s share of any amount recovered,” and that it may intervene upon a showing of good cause).

. Rule 11, however, is perhaps less intrusive vis-a-vis the Executive Power than judicial intervention at the indictment phase, as the guilty plea implicates the adjudication of guilt — a distinctly judicial function.

. There is also an argument that Article II’s Take Care Clause and Article Ill's standing requirement, resolved by the Court in Stevens, are two different sides of the same Separation of Powers coin. In both instances, the Judiciary may not enter into the traditional sphere of Executive power, and citizens cannot enlist the judiciary in a quest to police the government absent a personal interest distinct from that of all citizens. Although we find this argument persuasive, we limit our discussion to the issues examined herein.

. We note also that our holding does not differ from that of at least one member of the Supreme Court and other circuit courts. The dissent in Stevens plainly stated that the FCA’s qui tam provisions do not violate the Appointments Clause. 529 U.S. at 801, 120 S.Ct. 1858 (Stevens, J., dissenting). Circuit courts according with our view en banc regarding the Appointments Clause include the Sixth, Ninth, and Fourth Circuits. See, e.g., Taxpayers Against Fraud, 41 F.3d at 1041; Kelly, 9 F.3d at 758; Milam, 961 F.2d at 49 (implicitly supporting this argument and stating that "Congress has let loose a posse of ad hoc deputies to uncover and prosecute frauds against the government”).