United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 21, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-20376

_____

United States of America, ex rel., SALLY A. REAGAN,

Plaintiffs - Appellants,

versus

EAST TEXAS MEDICAL CENTER REGIONAL HEALTHCARE
SYSTEM; ET AL.,

Defendants,

EAST TEXAS MEDICAL CENTER REGIONAL HEALTHCARE
SYSTEM; EAST TEXAS MEDICAL CENTER REGIONAL
HEALTH FACILITIES; EAST TEXAS MEDICAL CENTER;,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Sally A. Reagan filed this qui tam lawsuit under the False

Claims Act, 31 U.S.C. § 3729 et seq. The district court granted

summary judgment in favor of the defendants, holding that the suit

was barred by the Act's jurisdictional bar (31 U.S.C. §

3730(e)(4)(A)) and, alternatively, that Reagan's claims failed on the merits.  Reagan appeals and we affirm.

                                    I

The University Park Hospital ("UPH") facility is owned by the East Texas Medical Center ("ETMC"), a subsidiary of the East Texas Hospital Foundation ("East Texas").  The UPH facility was built in the early 1980s as the cooperative project of Mother Frances Hospital ("Mother Frances") and East Texas Regional Health Care Facilities ("ET Facilities").  In January 1983 the Texas Health Facilities Commission issued a Certificate of Need ("CON") authorizing Mother Frances and ET Facilities to construct and operate UPH.  The CON directed that the UPH project costs must not exceed $5,378,250.  Moreover, the CON directed that $3,753,611 of the project costs be financed through the issuance of revenue bonds and that East Texas contribute $2,000,000 to the project.  Contrary to the CON, however, East Texas never contributed the $2 million that it had promised and, instead, the project was financed through a bond issue of $5.6 million.  Subsequently, UPH recognized that the project costs were going to exceed the anticipated amount and, consequently, the CON was amended to require the completion costs for the UPH project not to exceed $6,286,993.  Finally, in 1995 UPH was completed for a total cost of $6.2 million.

UPH leases its facilities from East Texas at an annual cost of $726,000.  UPH also purchases other "ancillary" services from the

East Texas defendants -- laundry, maintenance, radiology, laboratory services, etc.[1]

In April 1991 Sally Reagan ("Reagan") was hired as the executive director of UPH. Reagan alleges that, during her tenure at UPH she became suspicious of certain "financial irregularities", namely false Medicare reporting; she further alleges that in May 1992 she was terminated because she began to investigate these "irregularities".[2]

Following her termination, Reagan reported her suspicions to the Health Care Financing Administration ("HCFA"), the federal agency that administers the Medicare program for the United States Department of Health and Human Services ("HHS"). Reagan also reported her suspicions to Blue Cross and Blue Shield of Texas ("BCBS"), the fiscal intermediary between the HCFA and individual Medicare claimants in Texas.[3] Finally, Reagan filed a lawsuit

---

[1]The "East Texas Defendants" consist of East Texas Medical Center Regional Healthcare System, East Texas Medical Center Regional Health Facilities, and East Texas Medical Center.

[2]Most Medicare providers are reimbursed based on a "prospective payment system" whereby the providers are paid prospectively-fixed rates per patient discharge according to the patient's primary diagnosis. See 42 U.S.C. § 1395ww(d), 42 C.F.R. Part 412. Certain providers, such as psychiatric hospitals like UPH, are reimbursed on a "reasonable cost basis" where they are reimbursed the reasonable costs actually incurred in providing services to Medicare beneficiaries. See 42 C.F.R. Part 413.

[3]A "fiscal intermediary" is a private entity, typically an insurance company, that acts on behalf of the HHS Secretary to ascertain the Medicare payment due to the provider based upon the records the provider submits. See 42 U.S.C. § 1395h, 42 C.F.R. §§

against UPH, East Texas Medical Center, and others in Texas state court, alleging that she was terminated because she refused to go along with the defendants' alleged illegal Medicare reporting.

While the state court lawsuit was still pending, Reagan filed the instant action, on behalf of the United States government, under the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729, et seq., ("FCA") and the government chose not to intervene.[4] Specifically, Reagan alleged claims under §§ 3729(a)(1)-(3) and (7) of the Act.

Reagan's qui tam complaint alleged false statements to the government in essentially three general categories. First, Reagan claimed that UPH misrepresented its compliance with the CON requirements in reports filed with BCBS. Second, she alleged that

421.3, 421.100-421.128. The fiscal intermediary will make payments to the provider throughout the year based upon projections of the provider's allowable Medicare related expenses. See 42 C.F.R. § 413.64(e). The final determination of how much the provider should be paid for the year is made based on a year end cost report filed by the provider. See 42 C.F.R. §§ 413.24(f)(4), 413.64(f). After reviewing this report and requesting additional information if necessary, the intermediary will issue a Notice of Program Reimbursement ("NPR") indicating the total reimbursement due to the provider for the year. If the total projected payments for the year are less than the NPR amount, the Secretary will pay the deficiency; if, however, the provider has been overpaid, it must remit the excess to the intermediary. 42 C.F.R. §§ 405.1803(c), 413.64(f).

[4]Under the FCA, after a relator has filed suit the action is sealed and stayed and the United States is notified. 31 U.S.C. § 3730(b)(2). The complaint must remain under seal for at least 60 days while the government decides whether to intervene. Id. If, as in this case, the government chooses not to intervene, the relator may then prosecute the action herself. 31 U.S.C. § 3730(4)(B).

4

UPH falsely certified that it was in compliance with applicable Medicare regulations. Specifically, Reagan argued that UPH did not pay "reasonable" rates for goods and services purchased from East Texas, its parent, and failed to keep proper records of its actual expenditures. Finally, Reagan alleged that UPH misstated its status as a "related party" to East Texas and, as a result, received reimbursements to which it was not entitled.[5] The district court granted summary judgment in favor of the appellees, holding that Reagan's qui tam suit was barred by the Act's jurisdictional bar (31 U.S.C. § 3730(e)(4)(A)) and, alternatively, that Reagan's claims under §§ 3729(a)(1),(2) and (7) failed on the merits.

II

We must first address whether the district court properly dismissed Reagan's claims for lack of jurisdiction under the FCA's "public disclosure bar", found at 31 U.S.C. § 3730(e)(4). If the jurisdictional bar applies, then dismissal was proper and we need go no further. "[A] challenge under the FCA jurisdictional bar is necessarily intertwined with the merits" and is, therefore, properly treated as a motion for summary judgment. United States

---

[5]As discussed infra, certain costs, such as capital costs and costs paid to a "related entity", are subject to specific Medicare restrictions. See 42 C.F.R. §§ 413.130, 413.17. Related party transactions, however, are not prohibited; instead, the provider can only be reimbursed for the actual cost incurred by the related entity. 42 C.F.R. § 413.17. This actual cost must not exceed the price for which comparable services, products, or facilities could be purchased elsewhere. Id.

ex. rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co., 336
F.3d 346, 350 (5th Cir. 2003) (citations and quotations omitted).

A grant of summary judgment is reviewed de novo, using the
same standard as applied by the district court. Id. at 350-51;
Performance Autoplex II Ltd. v. Mid-Continent Casualty Co., 322
F.3d 847, 853 (5th Cir. 2003). A grant of summary judgment is
proper if, viewing the evidence and inferences drawn from that
evidence in the light most favorable to the non-moving party, there
is no genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. FED. R. CIV. P. 56(c);
Daniels v. City of Arlington, Tex., 246 F.3d 500, 502 (5th Cir.
2001). At the summary judgment stage, a court may not weigh the
evidence or evaluate the credibility of witnesses, and all
justifiable inferences will be made in the non-moving party's
favor. Morris v. Covan Worldwide Moving, Inc., 144 F.3d 377, 380
(5th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255 (1986)).

A

In general terms the FCA permits certain "suits by private
parties on behalf of the United States against anyone submitting a
false claim to the government". Laird, 336 F.3d at 351.[6]

---

[6]For general information regarding the procedure and history
of qui tam actions under the False Claims Act, see Riley v. St.
Luke's Episcopal Hosp., 252 F.3d 749, 752-53 (5th Cir. 2001) (en
banc), and Searcy v. Phillips Elec. N. Am. Corp., 117 F.3d 154, 160
(5th Cir. 1997)

The district court held that Reagan's FCA claims were barred under the "public disclosure" provision set forth in 31 U.S.C. § 3730(e)(4)(A). Under this provision:

> No court shall have jurisdiction over an action . . . based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or government accounting office report, hearing audit, or investigations, or from the news media, unless . . . the person bringing the action is an original source of the information.

This jurisdictional inquiry requires us to consider three questions: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the qui tam action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information." Laird, 336 F.3d at 352 (citing United States ex rel. Federal Recovery Services, Inc. v. Crescent City E.M.S., 72 F.3d 447, 451 (5th Cir. 1995)). The purpose of this jurisdictional bar is to accommodate the primary goals of the False Claims Act: (1) "promoting private citizen involvement in exposing fraud against the government" and (2) "preventing parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud". Laird, 336 F.3d at 351 (citing United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1511 (8th Cir. 1994)).

(1)

Under 31 U.S.C. § 3730(e)(4), we first ask "whether there has been a 'public disclosure' of allegations or transactions". Laird,

7

336 F.3d at 352. The "public disclosure" jurisdictional bar applies where the allegations have been disclosed in "a criminal, civil, or administrative hearing, in a congressional, administrative, or government accounting office report, hearing audit, or investigations, or from the news media". 31 U.S.C. § 3730(e)(4)(A).[7] In the instant case the district court held that Reagan's allegations had been publicly disclosed in three ways: (1) Reagan's state court lawsuit; (2) BCBS and HHS audits and investigations; and (3) documents procured by Reagan pursuant to requests under the Freedom of Information Act, 5 U.S.C. § 552 et seq.

With respect to Reagan's state court lawsuit, it is clear that the allegations disclosed there were publicly disclosed. "Any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for the purposes of section § 3730(e)(4)(A)" and "[t]his includes civil complaints". Fed. Recovery Serv., Inc., 72 F.3d at 450 (quoting United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1350 (4th Cir. 1994)). We will therefore move to the second method of disclosure at issue here, which requires more discussion.[8]

---

[7]Because we find that all of the relevant public disclosures fall within the enumerated list, we need not consider Reagan's argument that the list is exhaustive.

[8] The question arises why we need go any further to determine whether there has been a public disclosure, inasmuch as our finding

8

With respect to the BCBS audits and the HFCA investigation, the district court held that the information that formed the basis of Reagan's qui tam suit had been publicly disclosed through both the audits and the HFCA investigation. Specifically, the district court concluded that the BCBS audit was central to the issue of whether UPH and ETMC were "related entities" and that the HFCA investigations resulted in public disclosures. Thus, according to the district court, these audits and investigations put the government "on the trail" of the alleged fraud.

Reagan argues that the BCBS audits and the HCFA investigation did not constitute a public disclosure within the meaning of 31 U.S.C. § 3730(e)(4), because the reports did not disclose both (1) the true state of facts and (2) that the defendants represented the facts to be something other than what they were. See United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1048-49 (8th Cir. 2002). The record fails to support this contention. The core of Reagan's complaint is that ETMC and UPH were related entities, so they should not have been reimbursed by Medicare for anything other than the actual cost of

that the state court law suit constituted a public disclosure of the information underlying Reagan's FCA claims. It is necessary for us to address the disclosures made in the HCFA investigations, BCBS audits, and FOIA requests because it is not altogether clear the extent to which the state law claim disclosed all of the basic allegations made in Reagan's FCA claim. It is clear, however, that when the BCBS audits, the HCFA investigation, the FOIA requests, and the state court lawsuit are considered as a whole, the entire basis of her claim has been disclosed within the meaning of the FCA.

the goods and services sold to one another.  In cost reports submitted from 1985 to 1990, UPH claimed that it was not related to any East Texas entity.  In 1987 –- four years before Reagan came onto the scene –-  BCBS conducted an audit of the UPH cost report for fiscal year 1985, precisely because it believed this characterization of the relationship to be false.  Based on this audit and another conducted in 1991, BCBS determined the "true state" of facts –- that UPH and ETMC were related entities –- and reduced reimbursements for ancillary services and hospital lease payments by a total of approximately $2.25 million.

Reagan further argues that the information she later provided to BCBS and HCFA in 1995 cannot be regarded as "publicly disclosed", because to treat it as such would convert a statutory pre-condition to filing suit –- disclosure of the alleged facts to the government –- into a jurisdictional bar.  Reagan's disclosure to BCBS and HFCA, however, is not the government disclosure required by § 3730(e)(4)(B).  Under the FCA, a <u>qui</u> <u>tam</u> plaintiff, before filing suit, must voluntarily provide the relevant information to the United States Attorney, FBI, other suitable law enforcement office, or the agency or official responsible for the particular claim in question.  <u>See</u> <u>United States ex rel. Matthews v. Bank of Farmington</u>, 166 F.3d 853, 866 (7th Cir. 1999).  The explicit terms of the Act require that "[a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses" must be served on the government

to give it the opportunity to intervene.  31 U.S.C. § 3730(b)(2).

The statutorily required government disclosure was thus made in

September 1997 when Reagan filed her initial complaint in this

case.  The BCBS audits and HFCA investigations, on the other hand,

were conducted before Reagan initiated this lawsuit and were

properly considered public disclosures.[9]

We next turn to consider whether Reagan's FOIA requests also

constitute a "public disclosure".  Although this issue has not been

considered by this court, it was addressed by the Third Circuit in

United States ex rel. Mistick v. Hous. Auth. of the City of

Pittsburgh, 186 F.3d 376 (3rd Cir. 1999), where the court held that

"the disclosure of information in response to a FOIA request is a

'public disclosure'" under  § 3730(e)(4)(A).  Mistick, 186 F.3d at

383.  The Mistick court reasoned that the specific purpose of the

FOIA was to make certain information available for public scrutiny.

Id.  The court also found it persuasive that the Supreme Court had

---

[9] Reagan's argument is, in essence, that no disclosure to the
government by the relator should be considered a public disclosure.
Her reasoning is not fully clear to us.  The best translation of
her argument, however, is that a relator is hoisted on her own
petard, if the relator, acting in good faith to remedy the fraud,
discloses to the government the fraudulent activity, and then,
based on that disclosure, is barred from bringing suit.  This
argument fails wholly to take into account the original source
exception under the statute: if the relator is the original source
of such disclosure to the government, the "public disclosure bar"
does not apply.  Here, for example, if Reagan had been the original
source of the disclosure to the government -- i.e., if she had
"direct and independent knowledge" of the information publicly
disclosed to BCBS and HCFA -- she would not be barred from bringing
suit.

11

held that a FOIA request was a "public disclosure" for the purposes of the Consumer Product Safety Act, 15 U.S.C. § 2055(b)(1). Id. (citing Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108-09 (1980)) (stating that "[a] disclosure pursuant to the FOIA . . . seem[s] to be most accurately characterized as a 'public disclosure' within the plain meaning of [the Consumer Product Safety Act]"). Finally, the court concluded that the agency response to the FOIA request "constituted an 'administrative . . . report'", which is an enumerated public disclosure under § 3730(e)(4)(A), because the response (1) "constituted official government action" -- i.e. it is administrative -- and (2) "provides information and notification regarding the results of the agency's search for the requested documents" -- i.e., it is a report. Mistick, 186 F.3d at 383. Accordingly, we are persuaded by the reasoning of Mistick and hold that the response to Reagan's FOIA request is an administrative report constituting a public disclosure under § 3730(e)(4)(A).[10]

For all the reasons set forth above, we conclude that a "public disclosure" has occurred within the meaning of the FCA.

(2)

---

[10]The only contrary case cited by Reagan supporting her contention that the FOIA response is not a "public disclosure" is an unpublished opinion from the Fourth Circuit that offers no analysis. See United States ex rel. Bondy v. Consumer Health Found., 2001 WL 1397852 at *3 n.2 (4th Cir. Nov. 9, 2001).

We now turn to the next question of our jurisdictional inquiry: whether Reagan's qui tam action is "based upon" the publicly disclosed allegations. Laird, 336 F.3d at 352. "An FCA qui tam action even partly based upon public allegations or transactions is nonetheless 'based upon' such allegations or transaction[s]". Fed. Recovery Serv., 72 F.3d at 451 (quoting United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992)).

Reagan's qui tam action is certainly "partly based" -- indeed, in significant part -- upon her state court complaint, the BCBS and HCFA investigations, and the responses she received from her FOIA requests, all "publicly disclosed allegations". First, Reagan's state court lawsuit alleged that she was terminated from UPH because she refused to "become complicit in fraud and to aid and abet in criminal conduct" when she refused to go along with the defendants' alleged illegal Medicare reporting -- essentially the same allegations at issue in this case. Moreover, BCBS and the HCFA had investigated and reported on essentially the same allegations made by Reagan -- noncompliance with the CON and the rules regarding reimbursements for related parties -- before Reagan filed the instant lawsuit. Finally, Reagan attested that the information she obtained pursuant to the FOIA requests substantiated the allegations she made both in state court and her current claims under the FCA. See Fed. Recovery Serv., 72 F.3d at 451 (holding that a qui tam plaintiff cannot "avoid the

13

jurisdictional bar simply by adding other claims that are substantively identical to those previously disclosed in the state court litigation").

                                        B

Finally, because we have found that there has been a public disclosure, and that the instant action is "based upon" those disclosures, we do not have jurisdiction under 31 U.S.C. § 3730(e)(4) <u>unless</u> Reagan "is the 'original source' of the information".[11]  <u>Laird</u>, 336 F.3d at 352.  The "original source" exception explicitly requires the satisfaction of a two-part test: "(1) the relator must demonstrate that he or she has 'direct and independent knowledge of the information on which the allegations are based' and (2) the relator must demonstrate that he or she has 'voluntarily provided the information to the Government before filing' his or her qui tam action."  <u>Laird</u>, 336 F.3d at 352 (quoting 31 U.S.C. § 3730(e)(4)(B)).  It is undisputed that Reagan provided her "information" to the government before filing this <u>qui tam</u> action; therefore, the relevant inquiry is whether she had "direct and independent knowledge of the information on which the allegations are based".  <u>Laird</u>, 336 F.3d at 352.

---

[11]  The FCA defines an original source as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

14

Under this standard, the relator is not required to "have 'direct' and 'independent' knowledge of each false claim alleged in his complaint". Laird, 336 F.3d at 352-53.[12] Instead, the relator is simply required to possess direct and independent knowledge of the "information on which the publicly disclosed allegations are based". Laird, 336 F.3d at 355.

The plain meaning of the term "direct" requires "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." Laird, 336 F.3d at 355 (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY 640 (3d ed. 1961)). The relator's knowledge

---

[12]At the time of the district court's decision in this case this court had not addressed the meaning of the phrase "information on which the allegations are based". The district court, however, followed the magistrate judge's recommendation and adopted the interpretation followed by a minority of Circuit Courts of Appeals and defined the phrase to mean "the information underlying or supporting the fraud allegations in the plaintiff's qui tam complaint". See Laird, 336 F.3d at 354; U.S. ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 802 (10th Cir. 2002).

After the district court's decision, however, this court decided Laird, in which we rejected the approach taken by the district court. Instead, we followed the majority approach, defining the phrase as "information on which the publicly disclosed allegations are based rather than the information contained in the relator's qui tam complaint." Laird, 336 F.3d at 355.

Although Laird has determined that the district court applied the wrong standard, the error does not preclude our resolution of this issue, without remand, utilizing the Laird standard. Both parties have briefed the Laird standard to this court in light of the record, and on review of the summary judgment, we may consider the record de novo. Neither party has advanced the suggestion that application of Laird requires further factual development.

15

is considered "independent" if it is not derived from the public disclosure. See Laird, 336 F.3d at 355 (citing United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 690 (D.C. Cir. 1997); Minn. Ass'n of Nurse Anesthetists, 276 F.3d at 1048-49; United States ex rel. McKenzie v. Bellsouth Tele., Inc., 123 F.3d 935, 941 (6th Cir. 1997)). Under this approach, we are required to "look to the factual subtleties of the case before [us] and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." Laird, 336 F.3d at 356.

Our review of the qui tam claims made by Reagan convinces us that the knowledge underlying these claims is not "independent" within the meaning of 31 U.S.C. § 3730(e)(4)(B). We arrive at this conclusion because the knowledge is derived almost entirely from information that has been publicly disclosed. Reagan's knowledge of events surrounding the alleged non-compliance with the CON, as well as her knowledge of alleged misrepresentations regarding the amendment of the CON, are based entirely on public records of testimony by East Texas executives at the CON hearings in the early 1980s.

The only matter in which the information proffered by Reagan arguably is not derived entirely from public records implicates (slightly) the "related entity" status of UPH and ETMC. Reagan

16

states that she "observed the invoices" that ETMC sent to UPH each month for the building's lease and ancillary services and that she "knew from her experience as a hospital administrator" that other hospitals paid less for similar services and facilities. Reagan argues that based on this knowledge, and after her discharge from UPH, she began "piecing together fragments of documentation" through FOIA requests, interviews, and review of documents in the state archives, ultimately concluding (as indeed had BCBS in 1987 and 1991) that UPH and ETMC were "related entities".

In Laird, we held that the original source exception requires independent knowledge of "information on which the publicly disclosed allegations are based . . . ." 336 F.3d at 355. In this case, the public disclosure of the allegations -- i.e., the BCBS and HCFA investigations and the CON testimony -- was based upon events that transpired years before Reagan joined UPH. She admits that her knowledge of these events is not "independent", but instead is based on public records.

Thus, if Reagan can be said to have informed the government of anything that was new and independent from the earlier audits and investigations, it was only her disagreement with the results of the investigative work of BCBS and the HCFA; that is, that BCBS and the HCFA simply failed to recognize fully the fraudulent nature of the defendants' activities. This proffer is not information

17

obtained from "independent" knowledge; it is only a difference of opinion with respect to the same information.[13]

Neither does Reagan's knowledge meet the "directness" requirement of 31 U.S.C. § 3730(e)(4)(B). Again, by her own admission, the knowledge that she brings to the case is almost entirely indirect -- that is, based on research and review of public records, not, with minor exceptions, her own observation. Reagan argues, however, that her research and expertise enabled her to recognize the significance of the limited information to which she was privy and thereby "unearth" the knowledge that formed the basis of her claims.

It is true that some other circuits have held that a relator may meet the "direct and independent knowledge" requirement by

_____

[13]Reagan argues that, although the BCBS audits and HCFA investigation had already alerted the government to the related status of UPH and ETMC, she may still qualify as an original source if she made the same discovery independently. She relies on the Eighth Circuit's decision in Minnesota Ass'n of Nurse Anesthetists for the proposition that the original source exception of 31 U.S.C. § 3730(e)(4)(B) "does not distinguish between those who first bring a claim to light and others who later make the same discovery independently". 276 F.3d at 1048.

Unlike a number of other circuits, this court has yet to decide whether a party who independently and directly learns of information already publicly disclosed may qualify as an independent source. Compare Minn. Ass'n of Nurse Anesthetists, 276 F.3d at 1048, with Wang v. FMC Corp., 975 F.2d 1412, 1418-20 (9th Cir. 1992) (holding that only a person who caused the public disclosure may be an original source). Because Reagan's independent knowledge of the cost reports from 1991 is not knowledge of the information required by our holding in Laird (i.e., information on which the publicly disclosed allegations were based), we need not decide this question here.

18

contributing her own investigative efforts and experience to develop allegations of fraud. See, e.g., United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 568 (11th Cir. 1994); CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 11:63 (2004) (citing United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1161 (3d. Cir. 1991); United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 657 (D.C. Cir. 1994)). These cases, however, do not mean that second-hand information may be converted into "direct and independent knowledge" simply because the plaintiff discovered through investigation or experience what the public already knew. Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency "on the trail" of fraud, where that fraud might otherwise go unnoticed. See, e.g., U.S. ex rel. Cooper, 19 F.3d at 564, 568 (qui tam plaintiff was considered an original source because his investigation first alerted HCFA to specific violations of Medicare Secondary Payer law by Blue Cross Blue Shield of Florida); U.S. ex rel. Springfield Terminal Ry. Co., 14 F.3d at 648, 657 (plaintiff was deemed an original source because its investigation of phone records and pay vouchers from ongoing litigation first revealed fraud of a federally appointed arbitrator).

19

Reagan's extensive investigation did not put the government "on the trail" of any new malfeasance; it only led her to re-tread the same ground that BCBS and HCFA had already covered, and to reach a different conclusion. BCBS had already investigated ETMC's status as a related party before Reagan began working at UPH; and in 1991 -- approximately the same time Reagan began working at UPH -- had determined that UPH and ETMC were indeed related parties. As a result, it reduced reimbursements to UPH by over $2.25 million to reflect overpayments on the lease and for ancillary services. Furthermore, when BCBS also investigated Reagan's claims regarding the defendants' non-compliance with the CON in 1995, it determined that the defendants were in compliance.[14]

For the reasons discussed above, Reagan's investigation did not unearth important information about a false or fraudulent claim. Laird, 336 F.3d at 356. Instead, Reagan took disclosures that had already been investigated and reported by BCBS and HCFA and, based on her own experience, claimed that they were fraudulent; this disagreement with the legal conclusions of BCBS and HCFA does not qualify as "information" under the original source exception.

---

[14]At Reagan's behest, the results of the BCBS audits in 1987, 1991, and 1995 were reviewed by HCFA Regional senior auditor Freddie Kemp. Kemp determined that no further investigation of Reagan's allegations was necessary. In 1996, Kemp again reviewed the BCBS audits and found that they were well documented and "extraordinarily thorough".

Thus, because we conclude that Reagan was not the original source of the information underlying her claims, we hold that the claims are jurisdictionally barred by 31 U.S.C. § 3730(e)(4). The district court's dismissal of Reagan's claims for lack of jurisdiction is therefore

AFFIRMED.