**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA, ex rel.
VIRGINIA BELLE STONE, personal
representative of the Estate of JAMES S.
STONE, and UNITED STATES OF
AMERICA,

      Plaintiffs-Appellees and Cross-
      Appellants,

v.

ROCKWELL INTERNATIONAL
CORPORATION, and BOEING NORTH
AMERICAN, INC.,

      Defendants-Appellants and Cross-
      Appellees.

_____

AMERICAN HOSPITAL
ASSOCIATION, NATIONAL DEFENSE
INDUSTRIAL ASSOCIATION,
ELECTRONIC INDUSTRIES
ALLIANCE,

      Amici Curiae.

Nos. 99-1351, 99-1352, 99-1353

(D.C. No. 89-M-1154)
(D. Colo.)

---

**ORDER ON REMAND FROM THE
UNITED STATES SUPREME COURT
S. Ct. No. 05-1272**

---

Before **BRISCOE, HOLLOWAY,** and **HARTZ,** Circuit Judges**.**

**BRISCOE,** Circuit Judge.

This case is before us after the Supreme Court granted Rockwell International Corporation's petition for writ of certiorari and reversed the portion of our prior judgment in favor of plaintiff James S. Stone. Rockwell Int'l Corp. v. United States, __ S.Ct.__, 2007 WL 1388039 (May 14, 2007). Consistent with the Supreme Court's decision, we AFFIRM the district court's judgment in favor of the United States for the reasons stated in our prior panel opinion, United States v. Rockwell Int'l Corp., 282 F.3d 787 (10th Cir. 2002), and REMAND this case to the district court with directions to vacate the portion of the judgment entered in favor of Stone and dismiss Stone's portion of the Count One False Claims Act claims for lack of subject matter jurisdiction.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 5 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA, *ex rel.*
JAMES S. STONE, and UNITED
STATES OF AMERICA,

      Plaintiffs-Appellees and
      Cross-Appellants,

v.

ROCKWELL INTERNATIONAL
CORP., and BOEING NORTH
AMERICAN, INC.,

      Defendants-Appellants and
      Cross-Appellees.

Nos. 99-1351, 99-1352,
& 99-1353

AMERICAN HOSPITAL
ASSOCIATION, NATIONAL DEFENSE
INDUSTRIAL ASSOCIATION,
ELECTRONIC INDUSTRIES
ALLIANCE,

      Amici Curiae.

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, HOLLOWAY** and **HARTZ**[**] Circuit Judges.

_____

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]Judge Hartz has replaced the late Judge Politz on the panel.

**ORDER AFTER LIMITED REMAND**

The disposition of the instant appeals by published opinion for a divided panel was suspended on petition for rehearing, and the panel ordered a limited remand for findings and conclusions to ascertain whether the Relator, Mr. Stone, had satisfied the statutory requirement[1] of disclosing the information underlying his claims to the government prior to bringing this lawsuit. Our opinion, as modified on rehearing, is reported. *United States, ex rel. Stone v. Rockwell International Corp.,* 282 F.3d 787 (10th Cir. 2002). We will not attempt to summarize in this order the complex factual and legal background of this matter which is outlined in that opinion.

To proceed in accord with our remand order, the district court first received submissions from the parties consisting of motions supported by briefs, excerpts from the record, and additional material submitted by defendant Rockwell. The court then held a hearing on November 25, 2002, at which all counsel agreed that the record was adequate to enable the judge to make the findings and conclusions necessary. The judge made his findings and conclusions shortly after the hearing, addressing Mr. Stone's claims in three areas: pondcrete, saltcrete, and spray irrigation.[2]

As to the spray irrigation claims, the district court found that Mr. Stone had not made disclosure or at least not sufficiently specific disclosure. Defendant avers that this point is

---

[1] *See* 31 U.S.C. § 3730(e)(4).

[2] These terms are explained in our published opinion.

-2-

moot because the verdict for the time frame including this claim was in its favor. We agree.[3]

Thus, we need not concern ourselves with the district court's finding on this point.

Judge Matsch noted that Mr. Stone had conceded that he did not make pre-filing disclosure to the government of any knowledge he may have had underlying his claims with respect to "saltcrete." In its supplemental briefing submitted to this panel after the district court's completion of its task, defendant Rockwell does not suggest that this concession should have any effect on the judgment. In any event, from review of the record we have determined that the saltcrete and pondcrete allegations centered on the same time periods.[4] Consequently, if disclosure was made as to pondcrete, that would establish jurisdiction for the critical time period for which the jury awarded damages.

Thus, the real point of contention now is whether Stone disclosed the facts underlying his "pondcrete" claims to the government before commencing this suit.[5] On this issue, the district court made one especially significant finding – that a certain document had been produced to the government by Stone prior to suit having been filed. This document, an "Engineering Order" that Stone had attached as an exhibit to an affidavit filed in the district court, was noted in our previous opinion. The Engineering Order itself was an internal

_____

[3]*See* Pretrial Order, IV App. 1063, 1095 at ¶ 14 (setting out the time frame for plaintiff's spray irrigation claim); *id*. at 1119 (jury verdict form finding for defendant on claim covering that time period).

[4]*See* Pretrial Order, IV App. Tabs C & D, 1063, 1097-99.

[5]It is worth noting that the United States did not contend in the district court that Mr. Stone had failed to make the necessary disclosures to the government.

Rockwell document concerning pondcrete. On the Order, Stone had made these handwritten comments: "This design will not work in my opinion. I suggest that a pilot operation be designed to simplify and optimize each phase of the operation . . . ." 282 F.3d at 801.

Our view of this notation, as expressed in our opinion, is of critical importance in the present inquiry. We said, "This Engineering Order was explicit in articulating [Stone's] belief that the proposed design for making pondcrete was flawed." *Id*.

The district court, however, took a different view of the document:

His comment does not address whether the design to which he objects is for the method of pumping the ponds, the manufacture of pondcrete blocks or both. The document does not speak for itself and to find that Mr. Stone communicated his concerns to the government about the manufacture of pondcrete before the filing of this civil action requires the court to speculate about the content of conversations he had with the FBI and EPA agents and the Assistant United States Attorney.

Findings and Conclusions at 5. The judge then referred to the FBI agent's reports of interviews, known as 302 reports. The judge said that 302 reports

are merely summaries of the agent's recollections of the conversation, but it is also fair to infer that if Mr. Stone attached such importance to the potential for the leakage of toxic materials from the pondcrete blocks that later became the principal issue litigated at trial, there would be some reference to it in the agent's reports.

*Id*. at 5-6.

We conclude that the district judge erred in holding that the production of the document was insufficient to support a finding that Mr. Stone had communicated his concerns about the manufacture of pondcrete to the government before filing his action. This holding violated the law of the case, *see, e.g., Huffman v. Saul Holdings Ltd.*, 262 F.3d

1128, 1132 (10th Cir. 2001), because it is fundamentally irreconcilable with our previous holding, quoted above, about the import of the document.[6] *Our previous holding about the import of the document, together with the district court's finding on remand that the document had been produced to the government before suit was filed, are sufficient to carry Stone's burden of persuasion on this point.*[7]

Therefore, we hold that the jurisdictional disclosure requirement was satisfied. In accordance with our previous opinion, the judgment of the district court is **AFFIRMED**. Mr. Stone's pending motion to supplement the record is **DENIED** as moot. Rockwell's

---

[6]As appellant puts it:
[T]he District Court expressly found that Mr. Stone had provided to the Government in March 1988 – over a year *before* this action was filed – the very same documents on which this Court based its prior ruling that Mr. Stone satisfied the "direct and independent knowledge" prong of the original source test. This finding alone warrants denial of Rockwell's motion.
Plaintiff-Appellee/Cross-Appellant James S. Stone's Response at 1. *See also* Plaintiff-Appellee's March 7, 2003 Reply in Support of Cross-Motion For a Ruling Affirming the Judgment in its Entirety at 5.

[7]We find irrelevant the district court's inference that the document was not discussed with the FBI. As noted above, the court said that "if Mr. Stone attached such importance" to the subject, then it would be a fair inference that the 302 report would contain some reference to the subject. There is no statutory requirement that the relator have emphasized the specific facts on which a claim is later based, so long as the facts are disclosed.
Considering the volume of documents Stone produced to the government, and the number and scope of activities about which he was concerned, it would be unsound to draw the inferences made from an FBI agent's summarization of a meeting, as Judge Matsch himself had indicated on taking the case under advisement at the close of the hearing on remand. (It seems clear that Stone attached importance to all of the disclosures he made to the government concerning possible environmental consequences of mishandling of extremely hazardous materials, although the only relevant inquiry is whether he satisfied the disclosure requirements.)

motion for an order vacating the judgment of the district court is **DENIED**.

    **IT IS SO ORDERED.**

ENTERED FOR THE COURT


William J. Holloway, Jr.
Circuit Judge

Nos. 99-1351, 99-1352, 99-1353, U.S. ex rel. Stone v. Rockwell

**BRISCOE,** Circuit Judge, dissenting:

I respectfully dissent. In my view, the district court's factual findings on remand reinforce the unmistakable conclusion that Stone cannot establish that he qualifies as an "original source" under 31 U.S.C. § 3730(e)(4)(B). I therefore again conclude that Stone's claims should be dismissed for lack of subject matter jurisdiction.

As "the party invoking federal jurisdiction," Stone bore "the burden of alleging facts essential to show jurisdiction under the False Claims Act [FCA]." United States ex rel. Holmes v. Consumer Ins. Group, 318 F.3d 1199, 1202 (10th Cir. 2003) (en banc) (internal quotations omitted). Because his claims under the FCA were based on publicly disclosed information, in order to establish subject matter jurisdiction, Stone was required to prove he was "an original source of th[at] information." 31 U.S.C. § 3730(e)(4)(A). To do so, Stone first had to prove he "ha[d] direct and independent knowledge of the information on which [his] allegations [we]re based." 31 U.S.C. § 3730(e)(4)(B). In other words, Stone had to prove he had direct and independent knowledge of "any essential element of the [underlying] fraud transaction." United States ex rel. King v. Hillcrest Health Ctr., Inc., 264 F.3d 1271, 1280 (10th Cir. 2001) (internal emphasis and quotation omitted). Stone also had to prove he "voluntarily provided the information to the Government" before filing his qui tam action. 31 U.S.C. § 3730(e)(4)(B).

Count One of the amended complaint, asserted jointly by the United States and Stone, alleged generally that Rockwell violated the FCA by "knowingly presenting or causing to be presented to the government false or fraudulent claims for money or

property." App. at 995. In particular, Count One alleged that, during the course of ten six-month contract award periods (running from October 1, 1986, through December 30, 1989), Rockwell concealed from the DOE environmental, safety, and health problems related to the processing and storage of pondcrete and saltcrete. At trial, the jury found Rockwell had violated the FCA during three of the contract award periods at issue and awarded $1,390,775.80 in damages (an amount equal to ten percent of the total fee award bonuses received by Rockwell during the three contract award periods).

In my dissent to the original panel opinion, I outlined why Stone had failed to establish he was an "original source" with respect to these prevailing FCA claims. In short, I concluded that although Stone had accurately predicted in a 1982 "Engineering Order" written during the course of his employment that Rockwell's proposed design for making pondcrete would not work, App. at 439, there was no evidence that he directly and independently knew that Rockwell actually experienced problems when it began producing pondcrete or that Rockwell concealed the resulting environmental problems from the DOE. Not only did Stone's employment with Rockwell end well before either event occurred, his Engineering Order addressed neither the failure of pondcrete when it was later produced nor Rockwell's concealment of that failure from the DOE. The Engineering Order did not address these points for the simple reason it could not address events that had not yet occurred.

Although the district court's task on remand was focused solely on determining whether Stone had satisfied the "disclosure" component of the "original source" rule, its

findings reinforce the conclusions I reached in my original dissent. Specifically, the district court found that, prior to filing suit, the only information possessed by Stone and provided to the government concerning pondcrete was the 1982 Engineering Order in which Stone opined that the company's proposed design for making pondcrete was flawed. The majority concludes disclosure of the Engineering Order to the government satisfies the "disclosure" component of the "original source" rule. I disagree. Because the Engineering Order only conveyed Stone's professional opinion that the proposed pondcrete design would not work, the fact that he provided a copy of the Engineering Order to the government in March 1988 did not satisfy the "disclosure" component of the § 3730(e)(4)(B) "original source" rule. Aside from providing the Engineering Order to the government, there is no evidence that, prior to suit, Stone informed the government, or was even aware, that Rockwell actually experienced problems with its pondcrete production and concealed such problems from the DOE. Thus, Stone cannot qualify as an "original source" and his FCA claims should be dismissed for lack of subject matter jurisdiction.

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

UNITED STATES OF AMERICA, *ex rel.*
JAMES S. STONE, and UNITED
STATES OF AMERICA,

      Plaintiffs-Appellees and
      Cross-Appellants,

v.

ROCKWELL INTERNATIONAL
CORP., and BOEING NORTH
AMERICAN, INC.,

      Defendants-Appellants and
      Cross-Appellees.

AMERICAN HOSPITAL
ASSOCIATION, NATIONAL DEFENSE
INDUSTRIAL ASSOCIATION,
ELECTRONIC INDUSTRIES
ALLIANCE,

      Amici Curiae.

Nos. 99-1351, 99-1352,
& 99-1353

ORDER ON REHEARING
March 4, 2002

Before **BRISCOE**, **HOLLOWAY** and **POLITZ**,[*] Circuit Judges.

The petition for rehearing en banc of Defendants - Appellants Rockwell International Corp. and Boeing North American, Inc., was circulated to the members of the panel and all circuit judges of the court in regular service. There having been no request for a poll on the suggestion of rehearing en banc, that suggestion is denied.

The petition for rehearing by the panel has been considered by the panel and it has been determined that rehearing is granted for the limited purpose of modifying the opinion and ordering a limited remand to the district court as provided herein. The limited remand to the district court is for the purpose of that court making findings of fact and conclusions concerning the issue of disclosure prior to filing of this action in accordance with the False Claims Act, concerning the saltcrete, pondcrete and irrigation matters and any further proceedings in the district court which the District Judge deems necessary in connection therewith.

Upon completion of those proceedings, a supplemental record will be transmitted to this court containing the additional findings and conclusions made on this limited remand, and this court will otherwise retain jurisdiction of this cause. See *Penteco Corp. Limited Partnership v. Union Case System, Inc*., 929 F.2d 1519, 1522 (10th Cir. 1991).

---

[*]The Honorable Henry A. Politz, United States Circuit Judge for the Fifth Circuit, sitting by designation.

On all other issues except that requiring the additional factual findings and conclusions on the saltcrete, pondcrete and irrigation matters, the rulings made previously in our opinion are undisturbed. Upon receipt of the supplemental record of the proceedings below, final disposition of these appeals will be made.

The court's opinion as modified on rehearing by the panel is being filed along with this order.

ENTERED FOR THE COURT

Patrick Fisher, Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 4 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA, *ex rel.*
JAMES S. STONE, and UNITED
STATES OF AMERICA,

      Plaintiffs-Appellees and
      Cross-Appellants,

v.

ROCKWELL INTERNATIONAL
CORP., and BOEING NORTH
AMERICAN, INC.,

      Defendants-Appellants and
      Cross-Appellees.

Nos. 99-1351, 99-1352,
& 99-1353

---

AMERICAN HOSPITAL
ASSOCIATION, NATIONAL DEFENSE
INDUSTRIAL ASSOCIATION,
ELECTRONIC INDUSTRIES
ALLIANCE,

      Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 89-M-1154)**

---

Christopher J. Koenigs (Michael A. Williams and Michael B. Carroll, with him on the
briefs) of Williams, Youle & Koenigs, P.C., Denver, Colorado, for the Appellants/Cross-
Appellees Rockwell International Corp. and Boeing North American, Inc.

Maria L. Vullo (Robert E. Montgomery, Jr., Matthew Chavez, Jeannie S. Kang, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; Hartley D. Alley, Wheat Ridge, Colorado, with her on the briefs) of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for Appellee/Cross-Appellant James S. Stone.

Peter R. Maier, Civil Division, Appellate Staff, U.S. Department of Justice, Washington, D.C., (David W. Ogden, Acting Assistant Attorney General, Douglas N. Letter, Civil Division, Appellate Staff, U.S. Department of Justice, Washington, D.C.; Thomas L. Strickland, United States Attorney, Denver, Colorado, with him on the briefs), for the Appellee/Cross-Appellant United States of America.

Herbert L. Fenster, C. Stanley Dees, Mark R. Troy, McKenna & Cuneo, L.L.P., Denver, Colorado; Maureen D. Mudron, American Hospital Association, Washington D.C., filed a brief on behalf of the Amici Curiae, American Hospital Association, National Defense Industrial Association, Electronic Industries Alliance.

---

Before **BRISCOE**, **HOLLOWAY** and **POLITZ**,[*] Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

This appeal comes to us from the latest round of litigation arising from environmental violations that occurred during the 1980s at the Rocky Flats nuclear weapons plant ("Rocky Flats"), near Golden, Colorado. Previously, we considered related appeals in United States ex rel. Stone v. Rockwell Int'l Corp., No. 94-634 (10th Cir.); United States v. Rockwell Int'l Corp., No. 96-1530, 124 F.3d 1194 (10th Cir. 1997); United States ex rel. Stone v. Rockwell Int'l Corp., No. 97-1015 (10th Cir.); In re Special Grand Jury, No. 98-1073, 143 F.3d 565 (10th Cir. 1998); United States ex rel. Stone v.

---

[*]The Honorable Henry A. Politz, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Rockwell Int'l Corp., No. 98-1283 (10th Cir.); and United States ex rel. Stone v. Rockwell Int'l Corp., 173 F.3d 757 (10th Cir. 1999). The instant appeal concerns False Claims Act claims, 31 U.S.C. §§ 3729 et seq. (FCA), brought by the Government and James S. Stone, a qui tam relator, against Rockwell International Corporation and Boeing North American, Inc. ("Rockwell"), as well as breach of contract and common law fraud claims brought by the Government alone. After careful consideration, on rehearing by the panel we make a limited remand for further findings and conclusions and affirm the remaining rulings.

## I

From 1975 through 1989 Rockwell operated the Rocky Flats facility for the Department of Energy ("DOE") under a Management and Operating contract. Under this arrangement, Rockwell was compensated on a "cost-plus" fee basis, whereby Rockwell was reimbursed by DOE for "allowable costs" incurred in operating the plant and, once per year, received a "base fee" calculated at a pre-determined percentage of the overall value of the contract. In addition, the most significant portion of Rockwell's compensation for its management of Rocky Flats came in the form of an "award fee," a bonus paid every six months. The amount of this bonus was based on DOE's evaluation of Rockwell's performance in such areas as general management, production, and (critically for purposes of this appeal) environmental, safety and health operations.

James Stone began working at Rocky Flats as a Principal Engineer in the Facilities, Engineering and Construction Division, on November 10, 1980. He was promoted to the

position of Lead Principal Engineer for Rocky Flats' Utility Design Department, Facilities Engineering Division, where he worked until March 1986, when he was laid off.

On June 25, 1987, after he had been laid off by Rockwell, Stone informed Special Agent Jon S. Lipsky of the Federal Bureau of Investigations about environmental crimes that had allegedly occurred at Rocky Flats during Stone's tenure there. Explaining to Agent Lipsky that he had had "unlimited access" at Rocky Flats, Stone related a variety of allegations, including, inter alia, that contrary to public knowledge, Rocky Flats accepted hazardous and nuclear waste from other DOE facilities; that Rockwell employees were "forbidden from discussing any controversies in front of a DOE employee"; that although Rocky Flats' fluid bed incinerators failed testing in 1981, the pilot incinerator remained on line and was used to incinerate wastes daily since 1981, including plutonium wastes which were then sent out for burial; that Rockwell distilled and fractionated various oils and solvents although the wastes were geared for incineration; that Stone believed that the ground water was contaminated from previous waste burial and land application, and that hazardous waste lagoons tended to overflow during and after "a good rain," causing hazardous wastes to be discharged without first being treated. II App. at 457-59.

Using the information he had learned from Stone, Agent Lipsky sought and received a search warrant to search Rocky Flats. III App. at 778-787 (Lipsky Affidavit). Pursuant to this search warrant, on June 6, 1989, seventy five FBI and EPA agents conducted a search of Rocky Flats. Three days after Rocky Flats had been searched, Agent Lipsky's affidavit was unsealed, prompting intense media coverage of the

environmental violations alleged therein.  See, e.g., Bruce Finley & Thomas Graf, "Rocky Flats illegally burned, dumped waste, U.S. claims," Denver Post, June 10, 1989; Sue Lindsay & Janet Day, "FBI: Flats burned waste secretly," Rocky Mountain News, June 10, 1989.

Availing himself of the qui tam provision of the False Claims Act, 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States government.  The action shall be brought in the name of the Government."), on July 5, 1989 Stone filed the complaint that forms the basis for this appeal.  The complaint, filed in camera and under seal, stated an FCA claim alleging that Rockwell, while managing Rocky Flats, concealed environmental, safety, and health problems from DOE throughout the 1980s.  I App. at 81.  It alleged that from at least as early as November 1980, Rockwell had been legally required to comply with certain federal and state regulations, statutes, laws, and agreements, including, inter alia:  DOE Order 5483.1, as superseded by 5483.1A, for Occupational Safety and Health Program for Government-Owned Contractor-Operated facilities; DOE Order 6430.1, the DOE General Design Criteria Manual, and DOE Order 5480.2; Colorado statutes, including Hazardous Substances, Colo. Rev. Stat. §§ 25-5-501 et seq., the Air Quality Control Program, Colo. Rev. Stat. §§ 25-7-101 et seq., Asbestos Control, Colo. Rev. Stat. §§ 25-7-501 et seq., the Colorado Hazardous Waste Act, Colo. Rev. Stat. §§ 25-15-101 et seq., the Water Quality Control Act, Colo. Rev. Stat. §§ 25-8-201  et seq., Radiation Control, Colo. Rev. Stat. §§ 25-11-101 et seq., Hazardous Substance Incidents, Colo. Rev. Stat. §§ 29-22-101 et seq.,

-5-

and other specific provisions defining prohibited acts and reporting requirements with respect to hazardous substances, including, Colo. Rev. Stat. §§ 25-5-503, 25-8-506 & 608, 25-15-08, 309, 310, 29-22-101 & 108; federal statutes, including the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011 et seq., the Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801 et seq., the Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251 et seq., the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., the Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq., and federal regulations applicable or enacted under these statutes. I App. at 87-89.

Stone alleged that Rockwell committed numerous violations of the above stated laws and regulations in connection with its operation of Rocky Flats, and that "[i]n order to induce the government to make payments or approvals," Rockwell violated § 3729(a) of the FCA by, inter alia, knowingly presenting or causing to be presented to an officer or employee of the United States government, false and fraudulent claims for payment or approval, including requests or statements for payment, statements for reimbursement of costs, and applications for bonuses in connection with or under the Rockwell-DOE contracts; and knowingly making, using, or causing to be made or used, false records or statements intended to obtain approval and payment of these monies. I App. at 89-90.

In compliance with § 3730(b)(2) of the FCA, Stone filed his complaint in camera and provided to the Government a disclosure statement relating "substantially all material evidence and information" related to his claim in his possession. The relevant

-6-

portions of this Disclosure Statement are discussed in Part II, infra. II App. at 491

(Plaintiff's Confidential Disclosure Statement of Material Evidence and Information). The

United States, however, gave notice declining to intervene in the action, though it reserved

the right to intervene at a later date upon a showing of good cause. I App. at 114-15.

While Stone's FCA claim was proceeding, in March 1992, in the culmination of a

separate criminal investigation into Rockwell's management of Rocky Flats, Rockwell and

the United States entered into a plea agreement under which Rockwell pled guilty to ten

environmental violations. VI App. at 1861. Specifically, Rockwell's plea admitted

knowing storage of mixed hazardous wastes (pondcrete and saltcrete), in violation of the

Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(d)(2)(C); knowing

storage of mixed hazardous wastes (pondcrete and saltcrete) without a permit or interim

status, in violation of the RCRA, 42 U.S.C. § 6928(d)(2)(A); knowing treatment and

storage of mixed hazardous wastes (concentrated salt brine) without a permit or interim

status, in violation of RCRA, 42 U.S.C. § 6928(d)(2)(A); knowing storage of mixed

hazardous wastes (vacuum filter sludge) without a permit or interim status, in violation of

the RCRA, 42 U.S.C. § 6928(d)(2)(A); negligent violation of the Clean Water Act (CWA)

permit conditions (industrial wastes to the sewage treatment plant), in violation of the

CWA, 33 U.S.C. § 1319(c)(1)(A); negligent violation of CWA permit conditions (BOD

violations, March 1988), in violation of the CWA, 33 U.S.C. § 1319(c)(1)(A); negligent

violation of the CWA permit conditions (BOD/Fecal Coliform violations, April 1988), in

violation of the CWA, 33 U.S.C. § 1319(c)(1)(A); negligent violation of CWA permit

conditions (BOD violations, May 1988), in violation of 33 U.S.C. § 1319(c)(1)(A); knowing violation of CWA permit conditions (spray irrigation), in violation of the CWA, 33 U.S.C. § 1319(c)(2)(A); and negligent violation of CWA permit conditions (chromic acid spill), in violation of the CWA, 33 U.S.C. § 1319(c)(1)(A). As part of its plea, Rockwell agreed to pay $18,500,000 in fines. VI App. at 1861-63.

The FCA specifies that courts lack jurisdiction over FCA claims based on public information unless "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . unless the action is brought by the Attorney General or the person bringing the action is an original source of the information."). The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). In December 1992, Rockwell filed a motion to dismiss Stone's complaint for lack of subject matter jurisdiction on the ground that Stone failed to satisfy the FCA's requirement that he be an "original source."

In response, on February 27, 1993, Stone submitted an additional affidavit and attached to it his original Disclosure Statement. We discuss the relevant portions of this affidavit in Part II, infra. On February 2, 1994 the trial judge denied Rockwell's motion to dismiss, finding that "Mr. Stone had direct and independent knowledge that Rockwell's

-8-

compensation was linked to its compliance with environmental, health and safety

regulations and that it allegedly concealed its deficient performance so that it would

continue to receive payments." IV App. at 893-96.

On November 14, 1995, the United States moved to intervene with respect to some,

but not all of Stone's FCA allegations, and on November 19, 1996, the trial court granted

the motion to intervene. IV App. at 900 (The Government's Motion For Leave to

Intervene); id. at 964 (Memorandum Opinion and Order).

On December 20, 1996, in response to a suggestion from the trial judge,[1] the United

States and Stone ("Plaintiffs") filed an amended complaint stating six counts against

Rockwell. IV App. at 972. Count One stated a claim under the FCA, 31 U.S.C. §

3729(a)(1) & (2), brought by both the United States and Stone. IV App. at 995. Counts

Two through Five stated claims for common law fraud, breach of contract, payment by

mistake of fact, and unjust enrichment, and were brought by the United States alone. Id. at

996-1003. In Count Six, Stone (but not the United States), asserted an additional FCA

claim alleging that Rockwell knowingly presented or caused to be presented to the

Government false or fraudulent claims for money or property. Id. at 1004. The trial judge

subsequently ordered that a separate trial be held on this claim. VI App. at 1621.

---

[1] After the United States intervened, the trial judge suggested that an amended
complaint be filed to clarify the focus of the claims. Supp. App. at 88-89 ("Now, I have
noted, as already has been described, that there are sort of six areas, or the scope of claims
that Mr. Stone has presently in the pleadings has six different areas of interest, whereas
the government has talked about three apparently so far. So that's the stuff that needs
clarification in the amended complaint . . . .").

A jury trial was held on Counts One through Five. The main issue at trial was whether Rockwell concealed from DOE environmental, safety, and health problems related to the processing and storage of saltcrete and pondcrete, two forms of processed toxic waste. Regarding the FCA claims, the jury was given a verdict form that asked it to answer the question: "Did the plaintiffs prove by a preponderance of the evidence that the defendant Rockwell International Corporation violated the False Claims Act to get one or more of the following claims under the Department of Energy-Rockwell contracts paid or approved?" IV App. at 1119. The verdict form required the jury to answer that question for each of ten six-month periods, running from October 1, 1986, through December 30, 1989, each corresponding to an "Award Fee Period" or a period for which Rockwell received "Vouchers Accounting for Net Expenditures Accrued." Id. at 1119-20.

On April 1, 1999, the jury returned verdicts for Rockwell on the breach of contract claim and on seven of the ten FCA claims. However, the jury found for the Plaintiffs on the three remaining FCA claims and awarded $1,390,775.80 in damages. Id. After the jury verdict, when the Plaintiffs tendered a proposed form of judgment that included Stone as a party in whose favor judgment should be entered, Rockwell filed a post-trial memorandum arguing that Stone was not an "original source" for his amended FCA claims and thus was not entitled to judgment being entered in his favor or to recover attorney's fees and expenses. In response, the trial judge found that Stone was an original

source.[2]

On May 13, 1999, the district court dismissed with prejudice the United States'

claims for common law fraud, payment by mistake of fact, and unjust enrichment, his

order stating:

> At a hearing held on May 7, 1999, based on all of the evidence received at trial, the court ruled that, as a matter of law, judgment should enter for the defendants on the equitable claims of the United States for unjust enrichment and recovery of payments made by mistake because the remedy would be inconsistent with the jury verdict for the defendants on the claim for breach of contract. The court also ruled that judgment should enter for defendants, as a matter of law, under Fed. R. Civ. P. 50(a) on the claim of the United States for damages for common law fraud, a claim that was not submitted to the jury because the government withdrew it. In the alternative, considering the oral motion to withdraw as a motion under Fed. R. Civ. P. 41(a)(2), the court orders that dismissal of the claim must be with prejudice.

Accordingly, on June 10, 1999, the district court entered judgment in favor of the

Plaintiffs on the three FCA claims in the amount of $4,172,327 (awarding three times the

amount awarded by the jury pursuant to 31 U.S.C. § 3729(a)). The court also awarded the

United States a $15,000 civil penalty. Although one of Stone's FCA claims against

Rockwell had yet to be tried, the district court certified its judgment on the jury verdict

under Fed. R. Civ. P. 54(b).

Rockwell then filed this appeal, arguing that: (1) the trial court erred in finding that

---

[2]The trial judge noted, however, that Rockwell could appeal that determination; thus, when Stone filed motions seeking attorney's fees and expenses, the trial judge reserved ruling until after appeals on the grounds that an appeal "may well affect the determination of these motions." VI App. at 1570 (Order Reserving Ruling On Motions For Fees and Expenses).

Stone was an "original source" of the information on which his FCA allegations were based; (2) qui tam relators do not have standing under Article III of the U.S. Constitution; (3) the FCA's qui tam provisions violate the Take Care and Appointments Clauses of Article II of the Constitution; and (4) the trial court erred in instructing the jury that DOE employees' knowledge of the facts allegedly concealed from the DOE was relevant to the FCA claims only if such employees had "authority to act" under the Government's contracts with Rockwell. The Plaintiffs filed cross-appeals, Stone arguing that a new trial is required to award further damages under the FCA, and the Government arguing that: (1) the district court erred in failing to instruct the jury that Rockwell breached its contract with DOE; and (2) the district court erred in dismissing with prejudice its common law fraud action.

## II

### A

Rockwell's first claim of error is that the trial court erred in ruling that Stone was an "original source" of the information on which his FCA allegations were based.

The FCA specifies that courts do not have jurisdiction over claims based on publicly disclosed information "unless the action is brought by the Attorney General," or as applies here, "the person bringing the action is an original source of the information."

31 U.S.C. § 3730(e)(4)(A) (emphasis added).[3] An "original source" is defined as one who "has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." Id. at § 3730(e)(4)(B). Rockwell challenges as error the district court's determination (made by two judges, once in 1994 and again in 1999), that Stone was an "original source" of the information on which his FCA claims were based.

Because this involves a question of subject matter jurisdiction, we conduct our review de novo. United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999) ("This court . . . reviews issues of subject matter jurisdiction de novo.") (citing United States. ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 551 (10th Cir. 1992)). Since Rockwell has challenged the court's jurisdiction, the burden is on Stone to show, by a preponderance of the evidence, that jurisdiction exists. Id. Stone must therefore sustain "the burden of alleging the facts essential to show jurisdiction and supporting those facts with competent proof." Id. (internal quotations omitted). "Mere conclusory allegations of jurisdiction are not enough." Id. (quoting Penteco Corp.

---

[3]31 U.S.C. § 3730(e)(4)(A) provides in full:
No court shall have jurisdiction over an action under this section based upon public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

Ltd. Partnership v. Union Gas Sys. Inc., 929 F.2d 1519, 1521 (10th Cir. 1991)).


**B**

As an initial matter, we must consider Stone's contention that once the Government

intervenes, as happened here, the trial court's jurisdiction is conclusively established and

the original source requirement ceases to operate, on the theory that the case may proceed

by virtue of the Government's presence in the litigation.  We disagree.  Intervention by the

United States into a qui tam suit does not automatically endow the court with subject

matter jurisdiction over both the claims by the United States and by the relator.  We agree

with the Fifth Circuit's persuasive analysis which rejected a relator's attempt "to end-run

the 'original source' inquiry by arguing that the United States' intervention in the action

cured any jurisdictional defect."  That court held, and we agree, that in these

circumstances

> [s]uch intervention does not . . confer subject matter jurisdiction over the
> relator's claims.  Such a reading of the jurisdictional bar of 31 U.S.C. §
> 3730(e)(4) ignores the False Claims Act's goal of preventing parasitic suits
> based on information discovered by others.  Indeed, under [plaintiff's]
> interpretation, the United States' intervention would cure the jurisdictional
> defects in all suits, even those brought by individuals who discovered the
> defendant's fraud by reading about it in the morning paper.  The legislative
> history and policy behind the Act refute such a reading.

Federal Recovery Services, Inc. v. United States, 72 F.3d 447, 452 (5th Cir. 1995); see

also Eitel v. United States, 242 F.3d 381 (9th Cir., 2000) ("Whether or not the government

proceeds with this action [the relator] cannot because he is not an original source.").


-14-

Accordingly, we turn to the merits of whether Stone sufficiently demonstrated himself to be an original source of his allegations against Rockwell.

## C

On two occasions Rockwell challenged Stone's status as an original source: first, in a Fed. R. Civ. P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction in 1994, and then again in May 1999, after the jury had returned a verdict for the plaintiffs. Both times the court ruled that Stone was an original source.

On the first occasion the trial judge, Judge Carrigan, though acknowledging that Stone had conceded that he could identify neither the individuals who had allegedly falsely told the Government that Rockwell was in compliance with environmental, health, and safety laws, nor the specific documents containing these alleged misrepresentations, ruled that Stone nonetheless qualified as an original source. IV App. at 892-94 (Order at 3-4). Judge Carrigan based his ruling on his finding that Stone's duties at Rocky Flats included "plant-wide troubleshooting through which he gained knowledge of various environmental, health and safety problems," and that Stone had been "informed that Rockwell's compensation was based on compliance with applicable environmental, health and safety regulations."[4] Id. at 893. Further, Judge Carrigan found that Stone had been instructed by Rockwell "not to divulge environmental, health and safety problems to the

_____

[4]Judge Carrigan found that Stone had been given "a document stating that 'DOE will not even consider an award fee if we do not perform at least at a satisfactory level in all 37 FPAs,' including Nuclear Materials Management, Waste Management, Health Protection, Industrial Safety and Environmental Protection." Order at 4.

-15-

DOE." Id. Consequently, the judge ruled that given these findings,

> there is evidence that Mr. Stone had direct and independent knowledge that Rockwell's compensation was linked to its compliance with environmental, health and safety regulations and that it allegedly concealed its deficient performance so that it would continue to receive payments. The fact that Mr. Stone was not aware of the specific persons or documents involved does not erase this knowledge.

Id. at 893-94. Accordingly, Judge Carrigan concluded that Stone possessed "direct and independent knowledge" of the information on which his allegations were based. Order at 4-5. Judge Carrigan denied Rockwell's motion to dismiss for lack of subject matter jurisdiction. Id. at 6-7.

In April 1999, a jury returned a verdict for plaintiffs on these claims of violation of the False Claims Act, awarding compensatory damages of $1,390,775 on those claims. The jury found for the defendant on the seven other False Claims Act claims and on the Government claim for breach of contract. The case was then before Chief Judge Matsch, and he adhered to Judge Carrigan's ruling that Stone was a proper qui tam relator and also to his rejection of the challenge to the constitutionality of the qui tam statute.

As noted, to qualify as an original source a relator must establish (1) that he possessed direct and independent knowledge of the information on which his claim is based, and (2) that he voluntarily conveyed the information to the Government prior to filing suit. 31 U.S.C. § 3730(e)(4)(B). Rockwell challenges the sufficiency of Stone's showing on both these requirements.

**D**

We have explained that for purposes of determining whether a relator qualifies as an original source, the FCA's direct and independent knowledge requirement is properly construed to mean that the knowledge possessed by the relator must be "marked by the absence of an intervening agency . . . [and] unmediated by anything but the relator's own labor." United States ex rel. Hafter v. Spectrum Emergency Care, 190 F.3d 1156, 1162 (10th Cir. 1999) (quoting United States v. MK-Ferguson Co., 99 F.3d 1538, 1547 (10th Cir. 1996)) (alternations in original). In other words, "direct knowledge is knowledge gained by the relator's own efforts and not acquired from the labors of others," while independent knowledge means that "the relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources." United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1006-07 (10th Cir. 1996) (citation omitted).

United States ex rel. Hafter v. Spectrum Emergency Care is our most recent and fullest discussion of what is required for a relator to demonstrate direct and independent knowledge. Hafter concerned an appeal from the district court's grant of a motion to dismiss for lack of subject matter jurisdiction because the relator allegedly was not an original source. 190 F.3d at 1157-58. The relator had served as both an emergency room physician under an independent contract with Texas Emergency Room Services, P.A., an outside organization contracted to staff the Emergency Room at the Dallas/Fort Worth Medical Center, and as a medical director responsible for supervising emergency room

-17-

services and physicians.  After the Medical Center had terminated Texas Services'

contract, the relator's own contract with Texas Services was terminated.  Soon thereafter,

he was contacted by an attorney researching a medical malpractice case.  During their

interview, the relator told the attorney about alleged mismanagement of the emergency

room, who then used this new information to amend his malpractice complaint to include

alleged violations of the Texas Medical Practices Act.

Approximately one year after the filing of this suit, the relator filed his own qui tam

suit alleging false and fraudulent Medicare, Medicaid and/or Champus reimbursement

claims to the Government.  When the defendant moved to dismiss for lack of subject

matter jurisdiction, the district court ruled that because the information underlying his

complaint had been publicly disclosed in the earlier suit brought by the attorney who had

contacted the relator, the court could have jurisdiction only if the relator qualified as an

original source.  Finding that he failed to meet the dual requirements imposed on the

relator, the district court granted the motion to dismiss.

On appeal, we focused our inquiry on determining whether the relator had the

requisite direct and independent knowledge.  We determined that the burden was on the

relator to demonstrate that he had discovered the information on which his allegations

were based through his "own efforts and not by the labors of others," and that his

"information was not derivative of others."  Hafter, 190 F.3d at 1162.  On the facts

presented by the relator, we held that he failed to satisfy this burden.  We characterized his

complaint, which merely stated that he had "direct and independent knowledge of the

information upon which this suit is based," as stating only an "unsupported, conclusory allegation" and ruled that it was insufficient to establish jurisdiction. Id. Likewise, we found that the relator's memorandum submitted in response to the motion to dismiss was equally deficient. Because a "mere assertion of knowledge, without adequate basis in fact and unsupported by competent proof is insufficient to establish jurisdiction," we held that such "equivocal statements" were inadequate to satisfy the direct and independent knowledge element for an original source. Id. at 1163 (citing Wenz v. Memery Crystal, 55 F.3d 1503, 1508-09 (10th Cir. 1995)).

Notwithstanding Rockwell's claim that Stone's evidence of his direct and independent knowledge is inadequate to satisfy the specificity we required in Hafter, we believe that Stone has adduced sufficient competent proof to establish that he had direct and independent knowledge of the information on which his FCA claim was based. Unlike in Hafter, where the relator could muster only a conclusory submission to the court that he had direct and independent knowledge which was devoid of specifics, here review of the record convinces us that Stone has been specific and detailed in showing how he obtained, through his own efforts and not through the labors of others, direct and independent knowledge that Rockwell's designs for manufacturing pondcrete blocks would result in the release of toxic waste. Stone supplied the district court with an affidavit detailing his duties and responsibilities at Rocky Flats and describing his observations there that underpinned his FCA action. Stone averred that he commenced employment with Rockwell at Rocky Flats on November 10, 1980, as a Principal Engineer

in the Facilities, Engineering and Construction Division, and that he was subsequently promoted to Lead Principal Engineer for Rocky Flats' Utility Design Department, Facilities Engineering Division, where he continued to serve until his employment was terminated on March 17, 1986.  Stone averred that his duties at Rocky Flats included plant-wide "troubleshooting" and reviewing designs and existing operations  for safety and cost effectiveness.  II App. at 291.

In this affidavit Stone further averred that in the course of his work at Rocky Flats, he was assigned to a project addressing the manufacturing process for pondcrete, a mixture of cement and sludge and liquid from evaporation ponds containing toxic industrial wastes.  As part of his assignment, Stone averred that he "studied aspects of the design proposed by Rockwell management for making pondcrete," and that he "concluded that the suggested process would result in an unstable mixture that would later deteriorate and cause  unwanted release of toxic wastes to the environment."[5]  Id. at 298 (emphasis added).

Stone's affidavit states that he communicated his concerns about the pondcrete manufacturing process to Rockwell's management in an October 13, 1982 "Engineering Order," which he attached as an exhibit to his affidavit.  This Engineering Order was explicit in articulating his belief that the proposed design for making pondcrete was

---

[5]Stone also averred that he had noted, based on his "knowledge of the chemical processes at Rocky Flats, that the sludge and liquid present in the evaporation ponds contained some of the most toxic and radioactive substances at Rocky Flats, which made the unstable nature of the pondcrete particularly hazardous."

flawed: "This design will not work in my opinion.  I suggest that a pilot operation be designed to simplify and optimize each phase of the operation . . . ."  Id. at 439 (Engineering Order).  Despite this warning, Rockwell went forward and manufactured pondcrete using the allegedly deficient procedure.

Nor is Stone's affidavit the only document that establishes that he possessed direct and independent knowledge of alleged pondcrete manufacturing deficiencies.  We also find it significant that Stone in a July 5, 1989, confidential disclosure statement provided to the Government detailed how he became aware of Rockwell's allegedly faulty process for manufacturing pondcrete.  In a section of this statement entitled "Analysis of pondcrete method for drainage of solar evaporation ponds," Stone related:

> Solar evaporation ponds have, for some time, been used to treat . . . hazardous wastes.  Mr. Stone reviewed a design for the process and mechanical system intended to be used for removing sludge from these ponds.  The system was proposed by a Mr. Leon Fong.  Based on Mr. Stone's years of experience in the handling of sewage and sludge, he immediately recognized that the design could not work and would lead to serious problems.  For example, the system was designed to remove sludge from the pond and mix that sludge with cement in order to create blocks of "pondcrete" for disposal use.  Mr. Stone foresaw that the piping system would not properly remove the sludge and would lead to an inadequate mixture of sludge/waste and cement such that the "pondcrete" blocks would rapidly disintegrate thus creating additional contamination problems.

II App. at 509 (Plaintiff's Confidential Disclosure Statement of Material Evidence and Information) (emphasis added).

Moreover in his disclosure statement Stone described how Rockwell forbade him from discussing any environmental problems at Rocky Flats with the DOE.

-21-

In about September 1981, three managers, William Nichol, Sam Cerise and Robert Jensen, met with Mr. Stone regarding the communication with DOE. In that meeting, Mr. Nichol expressly told Mr. Stone that he did not want any government agency learning anything about problems or conditions that Mr. Stone may become aware of in connection with his employment at Rocky Flats. Mr. Nichol ordered Mr. Stone, in particular, not to communicate with the DOE regarding such matters, or with any government agency at all. Further, Mr. Stone was told that if he violated this gag order, he would be fired. Mr. Stone's request that this order be put in writing was refused.

Id. at 496 (emphasis added).

We believe that the information is sufficiently specific to satisfy the standard set out in the FCA and in our opinions. Stone clearly articulated in his affidavit and disclosure statement that he learned the facts underlying his claim by reviewing Rockwell's plans for producing pondcrete. We thus are convinced that he sufficiently alleged "specific facts – as opposed to mere conclusions – showing exactly how and when he . . . obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support[ed] those allegations with competent proof," and that this knowledge was discovered though his own labor. Hafter, 190 F.3d at 1162.

We are not persuaded by Rockwell's arguments to the contrary, which are permeated by a flawed understanding of the FCA's definition of direct and independent knowledge. The underlying assumption of Rockwell's arguments is that a relator must have direct and independent knowledge of the actual fraudulent submission to the government. Rockwell thus argues that to establish himself as an original source, Stone needed to have had direct and independent knowledge of the specific documents that

-22-

informed DOE that Rocky Flats was in compliance with environmental, health and safety laws, as well as the specific individuals who submitted those inaccurate claims.

The plain text of the FCA, however, belies this interpretation; the FCA is clear that for a relator to be an original source he need only possess "direct and independent knowledge of the <u>information on which the allegations are based</u>."  31 U.S.C. § 3730(e)(4)(B).  In <u>Hafter</u>, we explained that the phrase "information on which the allegations are based" means "the information <u>underlying or supporting</u> the fraud allegations contained in the plaintiff's <u>qui</u> <u>tam</u> complaint."  <u>Hafter</u>, 190 F.3d at 1162 (emphasis added).  We thus drew a distinction between the actual act of fraud, <u>i.e.</u> the actual submission of inaccurate claims by Rockwell to DOE, and the facts underlying or which give rise to the fraud, <u>i.e.</u> the environmental, health and safety violations themselves.  The relator need not, as Rockwell says, have in his possession knowledge of the <u>actual</u> fraudulent conduct itself; knowledge "underlying or supporting" the fraud allegation is sufficient.  <u>Id.</u>  Thus, we are persuaded that Stone's knowledge that a defective pondcrete manufacturing process would be employed, gained from his review of Rockwell's plans,  constitutes knowledge of information "underlying or supporting" his allegation concerning Rockwell's alleged ultimate fraudulent activity (the submission of claims to the DOE falsely stating that Rocky Flats was in compliance with environmental, health and safety laws).

For the same reasons, we are not persuaded by Rockwell's argument that Stone could not be an original source for the pondcrete claim because he no longer worked at

Rocky Flats when the manufacture of pondcrete blocks commenced. The gravamen of Stone's claim is that he learned from studying Rockwell's plans for manufacturing pondcrete that the blocks would leak toxic waste. The fact that he was not physically present at Rocky Flats when production began is immaterial to the relevant question, which is whether he had direct and independent knowledge of the information underlying his claim, in this case Rockwell's awareness that it would be using a defective process for manufacturing pondcrete.

Nor do we find persuasive Rockwell's argument that Stone could not have had direct and independent knowledge of the information on which his pondcrete claim was based because, Rockwell asserts, it is "preposterous" to think that the alleged defects in design Stone identified in his review of the designs later caused solidity defects in the pondcrete blocks. Appellant's Opening Brief at 37. Rockwell's objection does not carry weight; whether the alleged design flaws noted by Stone in his Engineering Report actually caused the production of malformed pondcrete blocks is immaterial. For a relator to be properly qualified as an original source, he must have had direct and independent knowledge of the information on which his claim is based. But whether that claim is ultimately flawed on the merits is an analytically distinct question from the one mandated by the FCA for establishing jurisdiction. It is for the finder of fact to determine whether the plaintiff's theory has merit; to satisfy the direct and independent prong of the original source test, the relator need only show that he possessed direct and independent knowledge of the information upon which his claim is based, not that his claim is factually

correct.

Therefore, we hold that Stone has adequately established himself as having direct and independent knowledge of his allegation that Rockwell manufactured insolid pondcrete (which Rockwell concealed from the Government).

**E**

On reconsideration of the second prong of the original source test — which requires that Stone have voluntarily provided the information underlying his pondcrete claim, his saltcrete claim and his irrigation claim to the United States before filing suit — the court finds that the record does not reveal specific and pertinent findings-of-fact by either of the judges who considered the pre-filing disclosure issue to support a conclusion whether the required disclosure was or was not made. While there is considerable material in our record on this issue, this appellate court should not perform the fact-finding function reserved for the district courts. *See Davis v. United States*, 192 F.3d 951, 961 (10th Cir 1999).

Accordingly, this court hereby directs that there be a limited remand to the district court for the purpose of findings and conclusions being made to ascertain whether the required pre-litigation disclosure to the Government was made, and for any further proceedings by any hearings that the district court shall find proper and necessary on this issue. We therefore make a limited remand for further proceedings in accord with this order, further findings, conclusions and a further ruling on the jurisdictional issue, which

shall be certified as a supplemental record to this court; otherwise this court will retain jurisdiction of these appeals.

## III

Rockwell presents a number of constitutional challenges to qui tam actions under the  FCA, arguing that qui tam relators lack Article III standing, that the FCA's qui tam provisions violate the Appointments Clause of Article II, and that they also violate the Take Care Clause of Article II.    We review de novo challenges to the constitutionality of a statute.  United States v. Hampshire, 95 F.3d 999, 1001 (10th Cir. 1996); United States v. Bolton, 68 F.3d 396, 398 (10th Cir. 1995).

## A

### Standing

Rockwell's challenge to the Article III standing of relators is easily disposed of. Recently, in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 120 S. Ct. 1858 (2000), the Supreme Court held that relators do have standing to litigate qui tam claims.  Id. at 1865 ("We think this history well nigh conclusive with respect to the question before us here: whether qui tam actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'  When combined with the theoretical justification for relator standing . . . it leaves no room for doubt that a qui tam

relator under the FCA has Article III standing.") (quoting <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 102 (1998)).  Therefore, we are obliged to reject Rockwell's contention that <u>qui tam</u> relators lack Article III standing.

The <u>Stevens</u> Court, however, was careful to specify that it was expressing no opinion concerning other constitutional challenges to <u>qui tam</u> actions, namely whether they violate the Take Care and Appointment Clauses of Article II.  <u>Id.</u> at 1865 n.8 ("[W]e express no view on the question whether qui tam suits violate Article II, in particular the Appointments Clause of § 2 and the 'take Care' Clause of § 3.").  Accordingly, we turn now to these remaining arguments.

**B**

**The Appointments Clause**

Rockwell argues that the FCA's <u>qui tam</u> provisions violate Article II's Appointments Clause, which states in part that the President shall nominate and "by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

By making this distinction, the Constitution establishes a bifurcated system of appointments: principal officers are appointed by the President with the "Advice and

Consent of the Senate," while Congress may vest the appointment of "inferior Officers" in "the President alone, in Courts of Law, or in the Heads of Departments." Edmond v. United States, 520 U.S. 651, 650-61 (quoting Article II). Rockwell suggests that the FCA's enforcement scheme permits private relators to "appoint themselves as prosecutors" and thus runs afoul of the requirements of the Appointments Clause because, according to Rockwell, Buckley v. Valeo, 424 U.S. 1, 126 (1976), mandates that only a properly appointed "Officer of the United States" may conduct litigation on behalf of the United States, and that relators are not appointed by any of the sanctioned methods of appointing officers. Appellant's Opening Brief at 48.

We are not persuaded that Buckley suggests that we should find an Appointments Clause violation here. The procedural requirements of the Appointments Clause only apply to the appointment of officers. Thus, the threshold question that we face is whether qui tam relators are "officers" for purposes of Article II. We conclude that they are not; qui tam relators do not serve in any office of the United States. There is no legislatively created office of informer or relator under the FCA. Relators are not entitled to the benefits of officeholders, such as drawing a government salary. And they are not subject to the requirement, noted long ago by the Supreme Court, that the definition of an officer "embraces the ideas of tenure, duration, emolument, and duties, and the latter were continuing and permanent, not occasional or temporary." United States v. Germaine, 99 U.S. 508, 511-12 (1878); see also Auffmordt v. Hedden, 137 U.S. 310, 327 (1890) ("His position is without tenure, duration, continuing emolument, or continuous duties, and he

-28-

acts only occasionally and temporarily. Therefore, he is not an 'officer' within the meaning of the clause of the constitution referred to.").

We therefore conclude that Rockwell construes Buckley too broadly: that opinion held that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl.2, of that Article." Buckley, 424 U.S. at 126. The Court was clear, however, that this definition of an officer of the United States should be construed in conformity with its prior Germaine and Auffmordt opinions, which the Buckley Court extensively quoted with approval. Id. at 124-25 & n.162. Since qui tam relators do not meet these requirements, quoted supra, we, like the other circuits that have considered the question, hold that the FCA's qui tam provisions do not contravene the Appointments Clause. See Riley v. St. Luke's Episcopal Hosp., 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc); United States ex rel. Taxpayers Against Fraud v. General Electric Corp., 41 F.3d 1032, 1041 (6th Cir. 1994); United States ex. rel. Kelly v. Boeing Co., 9 F.3d 743, 759 (9th Cir. 1993).


## C

### The Take Care Clause

We now direct our attention to Rockwell's argument that the FCA's qui tam provisions violate Article II's Take Care Clause, which establishes that the Executive is the branch of government which "shall take Care that the laws be faithfully executed."

-29-

U.S. Const., art. II, § 3. Rockwell contends that the FCA interferes with the Executive Branch's constitutionally assigned duty to enforce the nation's laws by conferring law enforcement powers on politically unaccountable private relators who are not subject to control by that Branch of the Government and who are motivated solely by private financial interests that may be inimical to the Government's interests. See Appellant's Opening Brief at 46.

On the facts of this case, we are not persuaded that a constitutional violation has occurred. Rockwell argues that the qui tam provisions run afoul of Morrison v. Olson, 487 U.S. 654 (1988), which established that congressional action must leave the Executive Branch with sufficient "control" over its litigation so as to "ensure that the President is able to perform his constitutionally assigned duties." Morrison, 487 U.S. at 696. Rockwell contends that application of the FCA's qui tam provisions violate the Morrison test because the Executive has no power to remove the relator from the lawsuit (31 U.S.C. § 3730(c)(3)); the Executive cannot control the breadth of the relator's claims (31 U.S.C. § 3730 (c)(3)); if the Executive seeks to intervene after initially declining to do so (as happened here) it may intervene only if the court finds "good cause" for such intervention, and even then the Executive cannot limit the relator's "status and rights" (31 U.S.C. § 3730(c)(3)); and if the Executive is allowed to intervene after initially declining to do so, it is barred from dismissing the relator's claims, and is thereby stripped of any power to terminate qui tam actions under those circumstances (31 U.S.C. § 3730(c)(3)).

We are not persuaded that in the circumstances of this case, the separation of

powers, as embodied in the Take Care Clause, has been transgressed. The Government

sought, and was granted permission, to intervene. Consequently, the Government was a

full and active participant in the litigation as it jointly prosecuted the case with Stone.

Given that the Government was permitted to intervene, we remain unconvinced by

Rockwell's contention that the presence of a qui tam relator in the litigation so hindered

the Government's prosecutorial discretion as to deprive the Government of its ability to

perform its constitutionally assigned responsibilities. Morrison, 487 U.S. at 695-96.[6]

Accordingly, we agree with the Fifth, Sixth, and Ninth Circuits, and hold that at

least where the Government intervenes, the qui tam provisions of the FCA do not violate

the separation of powers by transgression of the Take Care Clause. Riley, 252 F.3d at

753-57 ("[T]he qui tam portions of the FCA do not violate the constitutional doctrine of

separation of power by impinging upon the Executive's constitutional duty to take care

that the laws are faithfully executed under Article II of the Constitution."); Taxpayers

Against Fraud, 41 F.3d at 1041 ("The qui tam provisions adopted by Congress do not

contradict the constitutional principle of separation of powers."); Boeing, 9 F.3d at 755

("[T]he Executive Branch exercises at least an equivalent amount of control over qui tam

relators as it does over independent counsels. Thus, the FCA gives the Attorney General

sufficient means of controlling or supervising relators to satisfy separation of powers

---

[6]We express no opinion regarding whether the FCA's qui tam provisions violate the separation of powers or the Take Care Clause in circumstances other than those presented in this case, i.e. if the Government had sought permission to intervene, but was denied intervention by the district court, or if the Government desired to remove the relator from the action but was prevented from doing so by application of the statute.

concerns.") (footnote omitted).

We have examined relevant opinions of the Fifth, Sixth and Ninth Circuits and are persuaded that at least where the Government is permitted to intervene and does so, the qui tam provisions of the FCA do not violate the Take Care Clause provisions of Article II and their separation of powers principles. We have earlier discussed these decisions in Part II B in connection with the Appointments Clause and there held that the FCA qui tam provisions do not contravene that clause. We now focus on the Take Care Clause of Article II.

In Riley v. St. Luke's Episcopal Hospital, 252 F.3d 749, 753-57 (5th Cir. 2001) (en banc), the Fifth Circuit upheld the FCA qui tam provisions against Take Care objections where the Government chooses to intervene and does so. Riley noted that the Executive retains significant control over litigation pursued under the FCA by a qui tam relator, id., including power to veto settlements for example. The Fifth Circuit concluded that the qui tam portions of the FCA do not violate constitutional principles of separation of powers by impinging on the Executive's constitutional duty to take care that the laws are faithfully executed under Article II of the Constitution. 252 F.3d at 757.

The Sixth and Ninth Circuits expressed similar views. In United States ex rel. Taxpayers Against Fraud v. General Electric Co., 41 F.3d 1032 (6th Cir. 1994), a similar Take Care objection was made to the constitutionality of the FCA's qui tam provisions. The Sixth Circuit rejected the objections, agreeing with the Ninth Circuit's ruling in United States ex rel. Kelly v. Boeing Co., 9 F.3d 743 (9th Cir. 1993), cert. denied, 114 S.

Ct. 1125 (1994). The Sixth Circuit explained that the qui tam provisions do not

contravene the constitutional principle of separation of powers; that the statute was crafted

with particular care to maintain the primacy of the Executive Branch in prosecuting false-

claims actions, even where the relator has initiated the process; and that indeed, if the

Government decides not to intervene in a relator's case (which is not the case here) it may

still require the relator to inform it of developments, among other things. Thus, the Sixth

Circuit concluded that "the Executive Branch retains 'sufficient control" over the relator's

conduct to insure that the President is able to perform his constitutionally assigned

dut[y].'" Taxpayers, 41 F.3d at 1041 (citing Morrison v. Olson, 487 U.S. 654, 696 (1988)).

In sum, we hold that the qui tam provisions of the FCA do not violate the Take

Care Clause protective provisions of Article II in the circumstances of this case where the

Government intervened.

## IV

Both Stone and the Government argue that a new trial is required to award damages

to compensate for costs incurred in the repair of damage caused by the faulty pondcrete

blocks. They contend this is made necessary by the trial court's erroneous refusal to grant

their motion for a new trial on damages because the jury's damage award was improperly

influenced by allegedly irrelevant and prejudicial testimony.

In his instructions to the jury, the trial judge charged that damages in the form of

compensation for pondcrete repair costs should be awarded if they were incurred "because

of" Rockwell's FCA violations. Plaintiffs contend that despite this instruction, the jury,

-33-

though it found Rockwell liable, failed to compensate the Government for repair costs. Plaintiffs arrive at this conclusion from the fact that the jury award amounted to only $1,390,775.80 in damages – an amount exactly equal to ten percent of the fees paid by the Department of Energy to Rockwell during the period for which the jury found Rockwell liable. Plaintiffs contend that since during this relevant period "waste management" had a ten percent weight in the formula for calculating Rockwell's renumeration from the Department of Energy, the jury must have compensated the Government for its waste management fees only, and therefore wrongly excluded from its award the pondcrete repair costs.[7]

Plaintiffs argue that the jury's decision not to include pondcrete repair costs in its award of damages can only be explained by the jury having credited the "improperly admitted" testimony of defense expert witness Glen Sjoblom, who testified that the Department of Energy had reimbursed contractors for repair costs at other facilities. This testimony was improper, Plaintiffs maintain, because it addressed whether repair costs were reimbursable under the DOE-Rockwell contract, an issue that they contend is unrelated to the FCA claim and which the jury was not permitted to decide because "allowable" costs by contract are not non-recoverable as damages resulting from an FCA violation.

Plaintiffs' claim of error is predicated on the assumption that the jury calculated its

---

[7] Plaintiffs maintain that Rockwell's own expert testified that if Rockwell were to be found liable, the Government would be entitled to at least $302,000 for pondcrete repair costs. IX App. at 4663.

award of damages in an impermissible manner. Our holding in Midwest Underground Storage, Inc. v. Porter, 717 F.2d 493, 500-502 (10th Cir. 1983), however, establishes that such an assumption is not to be lightly made. In Midwest, we considered whether the district court should have granted a new trial based on a jury's award of damages in the amount of $3,911,637, a figure equaling the exact amount claimed by the plaintiff for "product shortage," a damage item that was contingent upon a finding that the defendant was liable on a counterclaim. However, even though the jury denied the counterclaim, it nonetheless awarded that exact amount. Despite this remarkable coincidence, we held that the defendant was not entitled to a new trial:

> While the likelihood of a coincidence in numbers may be very small, the possibility of the special attractiveness of $3,911,637 as a consciously selected damage award appears to us to be a distinct possibility. The jury had before it exhibit 104, which displayed a variety of numbers, including the $3,911,637 figure. Exhibit 104 also contained a damage figure for some of the state law claims which, when added with other figures of damage the jury could award, would come close to the $3,911,637 figure. The second plausible explanation is that the jury was confused . . . . The first explanation would require that we uphold the award, the second that we reverse and remand for a new trial . . . . Given this choice between a possible proper determination of a figure and a possible instance of jury confusion, we cannot freely exercise our own judgment as to the most plausible . . . . It is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it.

Id. at 501.

The issue in Midwest is legally indistinguishable from the one presented here. Accordingly, we hold that the district court did not abuse its discretion in denying Plaintiffs' motion for a new trial.

-35-

## V

The Government argues that the trial judge erred by dismissing with prejudice its claim for common law fraud. We note that during trial the judge expressed concern that the common law fraud claim could confuse the jury. VIII App. at 35, 70, Proceedings of March 16, 1999. On March 23, 1999, the Government moved to dismiss the fraud claim. IX App. at 4514. The Government's motion to dismiss was silent as to whether the dismissal would be with or without prejudice. However, in his Order for Entry of Final Judgment, the judge specified that the dismissal was with prejudice. See Order for Entry of Final Judgment Pursuant to Rule 54(b), at 2. The Government now argues that the court erred by dismissing the claim with prejudice.

We review the trial judge's dismissal with prejudice for an abuse of discretion. Ohlander v. Larson, 114 F.3d 1531, 1536-37 (10th Cir. 1997). Our review of the record convinces us that the trial judge did not abuse his discretion in stating the dismissal was with prejudice. Although the Government suggests that it was blind-sided by what it characterizes as a completely unexpected decision by the trial judge to dismiss the fraud claim with prejudice, we think the circumstances of the trial judge's ruling show otherwise.

On March 16, 1999, the fifteenth day of trial (the trial lasted twenty-five days), the trial judge informed counsel that he had decided not to submit the common law fraud claim to the jury because in his view the DOE's conduct made it ineligible for rescission, the remedy for fraud. The trial judge plainly told counsel: "Well I'm not going to submit

that claim. I don't think this is a rescission case. I think they've waived that remedy by their conduct after they knew what they knew." VIII App. at 3569 (emphasis added).

Our review of the record convinces us that counsel for the Government recognized that the trial judge would not submit the fraud claim to the jury because counsel's response to the trial judge was to ask that before the judge made a formal ruling, the Government be permitted to brief the issue: "I think that we would like – I would ask that we be permitted to submit something in writing to Your Honor before you make a final . . . ruling on that." Id. at 3569-70. The trial judge granted the Government permission to do so. Id. at 3570. In this same exchange, the judge said he did not know "why you've got a common law fraud claim in this case. You're just confusing the case, and you're going to confuse the jury and that doesn't help you. But that's your call." VIII App. at 3570.

There is no indication in the record that the Government made any written submission. However, seven days later, on March 23, 1999, counsel for the Government announced in court that he was moving to dismiss the common law fraud claim. He stated: "I do have authorization from my office to move to dismiss the common law [fraud] claim, and I'm doing so." IX App. at 4514. Government counsel made no comment indicating that the dismissal was with or without prejudice. The judge accepted the Government's statement about dismissal, saying "All right," and adding, "So that it would be breach of contract and false claims . . . I think that will help in clarifying the issues," to which Rockwell's counsel agreed. Id.

On May 13, 1999, the judge entered an "Order For Entry Of Final Judgment

-37-

Pursuant to Rule 54(b)." That order recited the returning of jury verdicts on April 1, 1999,

for the plaintiffs on three FCA claims, findings for the defendant on the other seven FCA

claims, and on the Government's claim for breach of contract. The order further stated

that the court

> also ruled that judgment should enter for the defendants, as a matter of law,
> under Fed. R. Civ. P. 50(a) on the claim of the United States for damages for
> common law fraud, a claim that was not submitted to the jury because the
> Government withdrew it. In the alternative, considering the oral motion to
> withdraw as a motion under Fed. R. Civ. P. 41(a)(2), the court orders that
> dismissal of the claim must be with prejudice.

Order at 1-2.[8]

We find no error in the judge's interpretation of the Government's oral motion to

dismiss as abandoning the common law fraud claim. Rule 41(a)(2) provides that after a

defendant has filed an answer, a plaintiff may voluntarily dismiss a claim only upon an

order of the court. Ohlander, 114 F.3d at 1536-37. The rule also provides that "[u]nless

otherwise specified in the order, a dismissal under this paragraph is without prejudice."

Fed. R. Civ. P. 41(a)(2). But a plaintiff may voluntarily dismiss his action "so long as the

defendant is not hurt," and the court's consent to voluntary dismissal may be conditioned

"upon such terms and conditions as the court deems proper." Marlow v. Winston &

---

[8]Thus, the trial judge ruled first that judgment should be entered for Rockwell on
the common law fraud claim as a matter of law under Fed. R. Civ. P. 50(a), and then
alternatively that considering the oral motion to withdraw as a motion under Fed. R. Civ.
P. 41(a)(2), the judge ordered that dismissal of the claim "must be with prejudice." See
Order for Entry of Final Judgment, at 2. Because we hold that the trial court did not
abuse its discretion in dismissing the claim with prejudice, we need not address whether
the court erred in its Rule 50(a) ruling.

Strawn, 19 F.3d 300, 303 (7th Cir. 1994) (quoting McCall-Bey v. Franzen, 777 F.2d 1178, 1184 (7th Cir. 1985)).  Typically, "a court imposes as a term and condition of dismissal [without prejudice] that plaintiff pay the defendant the expenses he has incurred in defending the suit, which usually includes reasonable attorney's fees." Marlow, 19 F.3d at 303 (citing 5 Moore's Federal Practice, ¶ 41.06 at 41-81 to 41-86 (1993)).

The Government relies, inter alia, on United States v. One Tract of Real Property, 95 F.3d 422 (6th Cir. 1996), arguing that the trial judge was obliged to give notice to the plaintiff of his insistence that the dismissal be with prejudice so as to permit withdrawal of the motion to dismiss.  Id. at 426.  The Sixth Circuit noted three factors to be considered in determining whether a trial judge abused his discretion by a dismissal with prejudice "in response to a plaintiff's request for dismissal without prejudice." Id. at 425.  Those factors were stated as: the judge giving notice of his intention to dismiss with prejudice; affording an opportunity to be heard in opposition to dismissal with prejudice; and giving the plaintiff an opportunity to withdraw the request for dismissal and proceed with the litigation.  Id. at 425-26 (citing Jaramillo v. Burkhart, 59 F.3d 78 (8th Cir. 1995); Marlow v. Winston & Strawn, 19 F.3d 300 (7th Cir. 1994); Andes v. Versant Corp., 788 F.2d 1033 (4th Cir. 1986)).  We are impressed by these factors and opinions, with which we do not disagree.  However, on careful consideration of the record in this instant case, we are persuaded that we are presented with a materially different case.

Unlike One Tract, Jaramillo, Marlow, and Andes, in each of which the plaintiff said the dismissal would be without prejudice, in the instant case the Government made no

-39-

such statement in its motion ("I do have authorization from my office to move to dismiss the common law [fraud] claim, and I'm doing so now," IX App. at 4514). On the other hand there was no statement the dismissal was with prejudice. We must therefore determine whether the judge abused his discretion, in the circumstances, by saying in the Order that "dismissal of the claim must be with prejudice." Order at 2.

In a similar controversy, the Seventh Circuit said the appellate court's task is to determine whether the interpretation by the trial judge was an abuse of discretion. See Babcock v. McDaniel, 148 F.3d 797, 799 (7th Cir. 1998) (where the plaintiff's motion to dismiss "did not speak to the issue of prejudice at all," the district judge was "required to interpret [the motion] one way or the other, and our task in reviewing the district court's decision is to determine whether the interpretation adopted by the district court was an abuse of discretion"). Given the context in which the Government's motion to dismiss was made here in proceedings on March 23, 1999 (IX App. at 4514), a week after the judge announced on March 16, 1999, that he was not going to submit the common law fraud claim to the jury (VIII App. at 3569), we are persuaded there was no abuse of discretion in ordering that the dismissal "must be with prejudice." Order at 2.

In these circumstances, we are persuaded that the judge did not abuse his discretion by providing that the dismissal must be with prejudice.

**VI**

To establish a violation of the FCA, the plaintiff must show that the defendant

presented a claim to the Government knowing it was false or fraudulent. United States ex

rel. Aakhus v. Dyncorp, 136 F.3d 676, 682 (10th Cir. 1998). The defendant, however,

may be able to cast doubt on whether he "knowingly" submitted a false claim by showing

that the Government itself was already aware of the facts underlying the FCA claim when

the allegedly fraudulent claim was submitted. United States ex rel. Butler v. Hughes

Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995).

Rockwell now claims that it tried to do this by presenting evidence purporting to

show that certain mid and low-level DOE employees believed that Rockwell had not

misled them. Rockwell thus argues that the trial judge erred in his instructions on the

intent requirement by instructing the jury that when assessing whether the plaintiffs had

shown that Rockwell had "knowingly" submitted false claims, they should consider "all

direct and circumstantial evidence, if any, concerning whether one or more government

employees with authority to act under the Rockwell contracts with DOE knew the relevant

facts concerning pondcrete, saltcrete and spray irrigation, and the costs incurred related to

those activities." IX App. at 5294.

Rockwell claims that this instruction limited the pool of Government officials to

DOE "contracting officers" only, and thus precluded the jury from considering any

knowledge obtained by mid and lower-level DOE employees. Consequently, Rockwell

contends that the jury was improperly prohibited from considering probative evidence that

mid-level and lower-level DOE employees were aware of the information that Rockwell

had allegedly concealed.[9]  The instruction at issue is set out in the margin.[10]

We conduct our review <u>de novo</u> to determine whether, as a whole, the jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards.  <u>Brown v. Gray</u>, 227 F.3d 1278, 1291 (10th Cir. 2000) (citing <u>United States v. Jackson</u>, 213 F.3d 1269, 1290 (10th Cir. 2000)).

We are convinced that the judge's jury instructions on the intent requirement were

---

[9]Stone argues that we should not consider this challenge to the jury instructions because Rockwell did not object to the proposed instruction at trial and thus did not preserve the issue for appellate review.  We do not agree, and are convinced that the issue was properly preserved.

[10]After informing the jury that in order for Rockwell to be liable for a FCA violation, the plaintiffs must establish that "Rockwell knew that the statements it made or used or caused to be made or used were false," the judge instructed the jury that

> Defendant claims that the government, through various employees of the Department of Energy, had prior knowledge of facts relating to the false statements that defendant allegedly made concerning pondcrete, saltcrete and spray irrigation operations at Rocky Flats.  The government denies the existence of such prior knowledge.  In considering whether Rockwell knowingly made any false statements, you must consider all direct and circumstantial evidence, if any, concerning whether one or more government employees with authority to act under the Rockwell contracts with DOE knew the relevant facts concerning pondcrete, saltcrete and spray irrigation, and the costs incurred relating to those activities.

> Government knowledge may negate the intent by defendant required to establish a violation of the False Claims Act.  If you find that government employees with authority to act under the contracts knew the relevant facts, then you may consider it in determining whether Rockwell knowingly presented a false statement as to those facts.

IX App. at 5292-94.

-42-

not in error. Notwithstanding Rockwell's assertions to the contrary, the trial judge did <u>not</u>

instruct the jury that they could only consider the knowledge of the DOE's "contracting

officers." Rather, the judge worded his instructions broadly, charging the jury that they

could consider the knowledge of all "government employees with authority to act under

the contract." Thus, it is clear from the plain language of the instructions that the judge

did not limit the relevant pool of DOE employees to "contracting officers"; nor has

Rockwell articulated any argument that persuades us that the phrase "government

employees with authority to act under the contract" is synonymous with "contracting

officers."[11] Consequently, there is nothing in the instructions indicating that the jury was

under the impression that they were prohibited from considering Rockwell's evidence that

mid and lower-level DOE employees knew of the environmental, health and safety

violations at Rocky Flats.

Accordingly, we hold that the trial judge did not err in his jury instructions on the

intent requirement.[12]

---

[11]Indeed, the contract between Rockwell and the DOE defines a "Contracting Officer" as "a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer." VI App. at 1669. Thus, the phrase "government employees with authority to act under the contract" appears to encompass a broader range of individuals than does the contract's quite narrow definition of a "Contracting Officer."

[12]We are convinced that our decision is consistent with the Ninth Circuit's opinion in <u>United States ex rel. Butler v. Hughes Helicopters, Inc.</u>, 71 F.3d 321 (9th Cir. 1995), which Rockwell relies upon. <u>Butler</u> rejected the argument that for purposes of determining whether the defendant "knowingly" submitted a false claim to the

The Government's breach of contract theory was based on the argument that

Rockwell's failure to operate the Rocky Flats facility in compliance with applicable

environmental laws represented a breach of contract.  To this end, the trial judge

instructed the jury:

> The government also alleges that defendant breached the DOE/Rockwell contract through operational failures relating to defendant's production, handling and storage of pondcrete and saltcrete at Rocky Flats.  Defendant denies the government's allegations.
>
> For the government to recover on its claim for breach of express contract relating to alleged operational failures, you must find the government has proven all of the following by a preponderance of the evidence.
>
> One, <u>defendant failed to use its best efforts</u> in its production, handling or storage of pondcrete and saltcrete.
>
> Two, <u>such operational failures resulted from willful misconduct or lack of good faith on the part of the plant manager, Mr. Sanchini, or those Rockwell managerial employees responsible to Mr. Sanchini, thereby breaching the contract</u>.
>
> And, three, resulting damage to the government caused by the breach of contract.

IX App. at 5299-300 (emphasis added).

Then, the judge re-emphasized to the jury that it could not find Rockwell liable if it

---

Government, only contracting officers' knowledge is relevant.  Instead, the court held that the knowledge of government "technical representatives" may also be considered.

Because, as discussed above, we find no evidence in the instant case that the jury was instructed to restrict their consideration exclusively to contracting officers, there is no contradiction between <u>Butler</u> and our holding here.

found that Rockwell had used its "best efforts" to comply with its obligations under the contract:

> Under the terms of both the 1986 and 1989 DOE/Rockwell contracts, defendant was obliged only to use its best efforts to comply with its responsibilities under the contract. <u>If the defendant used its best efforts to perform its contractual obligations, then defendant was entitled to receive or retain its costs for what it did in relation to the contract, and the government may not recover on its claim for breach of contract</u>, despite the failure, if any, of defendant to meet the contractual requirements.

<u>Id.</u> at 5300 (emphasis added).

The Government now argues that the district court erred both by instructing the jury on "best efforts" and by failing to instruct the jury to find Rockwell liable for breach of contract. It contends that because Rockwell's contract with DOE imposed a duty on Rockwell to comply with all applicable environmental laws, including the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992, Rockwell's guilty plea to violations of that statute conclusively establishes that it breached its duties under the contract and that it could not re-litigate that issue.[13] <u>See</u> Reply Br. for Appellee/Cross Appellant the United States, at 6 (citing <u>United States v. Broce</u>, 488 U.S. 563, 569 (1989)). The Government thus argues that the judge "improperly added an intent requirement to the elements of a breach of contract claim" and should have instructed the jury to find that Rockwell breached its contract with DOE.

_____

[13]For its argument in the nature of collateral estoppel, the Government points to the "Plea Agreement and Statement of Factual Basis" entered in <u>United States v. Rockwell Int'l Corp.</u>, No. 92-CR-107, District of Colorado, a document which was admitted in evidence in the instant civil action as Plaintiff's Ex. 1. VI App. at 1861-92.

-45-

We are persuaded that the judge did not err in his instructions. We are convinced that both the text of the contracts and relevant case law establish that the "best efforts" instruction was correct. In the section of the contracts entitled "Scope of Work," it was provided:

> The Contractor shall, in accordance with the provisions of this contract, <u>use its best efforts</u> to manage, staff, maintain, and operate the Rocky Flats Plant within available funds so as to carry on in an efficient manner all necessary and related services and operations for the purpose of developing and producing (at such rates, and in conformance with such specifications, as the Contracting Officer may direct in writing from time to time) weapons components, assemblies, and ancillary equipment and for performing related services and operations within the time scales requested by the Contracting Officer.

VI App. at 1708 (Appendix B to Contract, at 1) (emphasis added).

We are convinced that this language resolves the question of whether the judge was correct in instructing the jury that Rockwell owed to the DOE only its "best efforts." Moreover, our review of relevant case law confirms that the trial judge did not err in his instructions on this point. For instance, <u>McDonnell Douglas Corp. v. United States</u>, 37 Fed. Cl. 295 (1997), involved an action brought in the United States Court of Federal Claims by defense contractors for equitable adjustment and conversion of termination for default, to one for convenience of the Government. <u>Id.</u> In determining the rights of the contractors and the Government, the trial judge said that the "best efforts" standard summarizes the basic nature of the cost-reimbursement contract, and that such a contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price. <u>Id.</u> at 298 (citing <u>General Dynamics Corp. v. United States</u>, 671 F.2d 474 (Ct.

-46-

Cl. 1982)). The judge concluded that "[i]f, despite its best efforts, the contractor cannot meet its contractual requirements, the government has obtained precisely what it bargained for, namely the contractor's best efforts . . . ." McDonnell Douglas, 37 Fed. Cl. at 198.

Although the Government, in developing its collateral estoppel theory, relies on Sell v. United States, 336 F.2d 467, 475 (10th Cir. 1964), and United States v. Rivera Ramos, 856 F.2d 420, 420 (1st Cir. 1988), cert. denied, 493 U.S. 837 (1989), we are not persuaded. In Sell, this court stated that findings in a criminal case were admissible in the civil case at issue under res judicata or estoppel by judgment principles, "insofar as such findings determined issues identical to both cases." Sell, 336 F.2d at 475 (emphasis added, footnote omitted). We feel, however, that the issue of fact about making "best efforts" here to comply with the contractual duty is not the same as the fact issues determined by the guilty plea in the criminal case. Consequently, although Rockwell did previously plead guilty to violating the Resource Conservation and Recovery Act,[14] we are convinced that this plea did not, as the Government contends, preclude the jury from finding that Rockwell engaged in its best efforts and thus that it complied with its obligations under the contract.

After careful consideration of this issue, we are of the opinion that a reasonable jury

---

[14]Specifically, in Count One of the plea agreement, Rockwell pleaded guilty to "Knowing Storage Of Mixed Hazardous Wastes (Pondcrete and Saltcrete) in Violation of RCRA Requirements, 42 U.S.C. § 6928(d)(2)(C)"; and in Count Two, Rockwell pleaded guilty to "Knowing Storage Of Mixed Hazardous Wastes (Pondcrete and Saltcrete) without a Permit or Interim Status, in Violation of RCRA, 42 U.S.C. § 6928(d)(2)(A)." See note 17, supra.

could find (and in this case, did find) that a defendant who violated applicable laws nonetheless used its best efforts to fulfill its obligations under the contract, and thus find that no breach occurred.[15]  Accordingly, we hold that the trial judge did not err by not instructing the jury to find that Rockwell breached its contract with the DOE.

## VIII

In sum, we are persuaded that the rulings of the district court should be affirmed on all issues except the issue of pre-filing disclosure discussed in Part II-E.  As to that issue only, the cause is remanded to the district court for the limited purpose of determining whether Mr. Stone satisfied the pre-filing disclosure prong of the "original source" test in compliance with the statute which requires the qui tam relator to have voluntarily provided the information before filing suit.  See United States ex rel. King v. Hillcrest Health Center, 264 F. 3d 1271, 1280 (10th Cir. 2001).

As the Supreme Court made clear in Vermont Agency of Natural Resources v. United States ex rel. Stephens, 120 S. Ct. 1858 (2000), qui tam relators do not lack Article III standing.  The FCA's qui tam provisions do not violate Article II's Appointments Clause, nor its Take Care Clause, at least where the Government intervenes.  The court did not abuse its discretion in denying the Plaintiffs' motion for a new trial for damages.  Nor

---

[15]Of course, a jury could also find that the defendant did not use its best efforts, and thus that it breached its contract.

did it abuse its discretion in providing that the Government's dismissal of its common law fraud claim must be with prejudice. Finally, the court did not err in its jury instructions concerning either the knowledge of DOE officials or whether the contract obligated Rockwell only to use its "best efforts."

Accordingly, we **affirm in part and remand for the limited purposes we note.** This court will retain jurisdiction of these appeals pending the district court's proceedings and further ruling on the pre-filing disclosure requirement, following which a supplemental record shall be certified to this court for final disposition.

If the trial judge finds there was no proper pre-litigation disclosure to the Government by Stone, the judgment for the Government will be modified as the statute requires and the judgment for Stone vacated. If the judge finds there was proper disclosure by Stone to the Government, the judgment for Stone and the Government will stand. This court retains jurisdiction to make its final disposition after review of the supplemental record.

IT IS SO ORDERED.

Nos. 99-1351, 99-1352, 99-1353; <u>United States ex rel. Stone v. Rockwell</u>

**BRISCOE, Circuit Judge, concurring and dissenting:**

I agree with the majority's resolution of every issue except for its conclusion that James Stone qualifies as an "original source" under 31 U.S.C. § 3730(e)(4)(B). In my view, Stone has established only that he had direct and independent knowledge of background information pertaining to Rockwell's pondcrete operations, and thus fails to qualify as an "original source" under § 3730(e)(4)(B).

The False Claims Act defines the term "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). We have further defined both the type and kind of knowledge that an original source/relator must have. In <u>United States ex rel. Hafter v. Spectrum Emergency Care, Inc.</u>, 190 F.3d 1156, 1162-63 (10th Cir. 1999), we held that to satisfy the "direct and independent knowledge" requirement, a relator must offer more than "secondhand information, speculation, background information or collateral research." Instead, we held, the relator "must allege specific facts . . . showing exactly how and when he or she obtained direct and independent knowledge of the *fraudulent acts alleged in the complaint* and support those allegations with competent proof." <u>Id.</u> at 1162 (emphasis added). We recently reaffirmed the type and kind of knowledge required of a relator in <u>United States ex rel. King v. Hillcrest Health Ctr., Inc.</u>, 264 F.3d 1271 (10th Cir. 2001), emphasizing that the

phrase "information on which the allegations are based" refers to "*any* essential element of the [underlying] fraud transaction." Id. at 1280 (internal quotations omitted).

Count One of the amended complaint, asserted jointly by the United States and Stone, alleged that Rockwell violated the FCA by "knowingly presenting or causing to be presented to the government false or fraudulent claims for money or property." App. at 995. Count One focused on three separate environmental, safety and health violations which Rockwell allegedly concealed from the government. The jury ruled in favor of Stone and the government on one of the three claims in Count One. The jury concluded Rockwell had submitted false claims to the DOE in violation of the Act as regards its pondcrete and saltcrete operations and awarded damages.

The question before us is whether Stone qualifies as an "original source" with respect to the portion of the Count One FCA claims upon which he and the government prevailed at trial. Those prevailing claims focused on Rockwell's submission to the DOE of false statements regarding its pondcrete and saltcrete operations between April 1, 1987 and September 30, 1988. As outlined above, Stone must demonstrate, in part, that he had direct and independent knowledge of one or more of the essential elements of those claims.[1]

---

[1] I note the first claim in Stone's initial complaint, filed July 5, 1989, was much broader than Count One of the amended complaint upon which Stone and the government ultimately prevailed. Judge Carrigan's ruling that Stone was a relator under the FCA pertained to Stone's initial complaint. Our focus in this appeal is on Count One of the amended complaint and whether Stone is a relator as regards those claims. See United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1164 n.10 (10th Cir. 1999).

It is undisputed that Stone possessed significant background information regarding Rockwell's pondcrete operations. According to Stone, managers at the Rocky Flats facility began considering the idea of producing pondcrete, in order to dispose of sludge from the facility's solar ponds, in the fall of 1982. At that time, Stone was assigned the task of studying "aspects of the design proposed by Rockwell management for making pondcrete." App. at 298. "After careful study, [he] concluded that the suggested process would result in an unstable mixture that would later deteriorate and cause unwanted release of toxic wastes to the environment." Id. Stone communicated his concerns to Rockwell management in a written memo. Id. at 298, 439 ("This design will not work, in my opinion."). According to Stone, Rockwell management nevertheless "went forward with the project without making the changes necessary . . . to eliminate the instability of the pondcrete blocks." Id. at 299.

Notwithstanding Stone's background knowledge, there is no evidence that he directly and independently knew about the actual problems that arose with the pondcrete after it was produced or Rockwell's efforts to conceal those problems from the DOE. Indeed, Stone was terminated from his employment with Rockwell well before either event occurred. Thus, although Stone predicted that problems would occur with the production of pondcrete,[2] and perhaps may have speculated that Rockwell would conceal

---

[2] The majority suggests that, in light of the conclusions reached by Stone in 1982, Rockwell was "aware[] that it would be using a defective process for manufacturing pondcrete." Maj. Op. at 27. I think this stretches the evidence too far. Although Rockwell was clearly aware of Stone's opinions, it is entirely plausible that Rockwell management nevertheless believed the proposed pondcrete manufacturing process would

-3-

any such problems from the government, it is apparent that he lacked the "direct and independent" knowledge required by the FCA's "original source" provisions. Cf. United States ex rel. Aflatooni v. Kitsap Physicians Serv., 163 F.3d 516, 526 (9th Cir. 1999) (concluding relator who offered only speculation and conjecture that defendant committed the alleged fraud did not qualify as an original source); United States ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1159 (2d Cir. 1993) (concluding that plaintiff, who performed collateral research and possessed background information which enabled him to understand the significance of publicly disclosed information, did not qualify as an original source). More specifically, Stone lacked direct and independent knowledge of any of the essential elements of the Count One claims, i.e., that Rockwell actually experienced problems in its production of pondcrete, that Rockwell failed to disclose those problems to the government and in fact represented to the government that there were no environmental problems at Rocky Flats, or that Rockwell knowingly concealed the true state of affairs in order to obtain benefits under its contract with the government. See United States v. Mackby, 261 F.3d 821, 826 (9th Cir. 2001) (concluding that the government must prove three elements to establish a cause of action under the FCA: (1) a "false or fraudulent" claim, (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval, and (3) with knowledge

_____

work. In any event, it is not Rockwell's decision to go forward with the proposed manufacturing process that gave rise to the Count One FCA claims. Rather, the Count One FCA claims are based on Rockwell's concealment of actual problems that arose after the manufacturing process began.

that the claim was false). This conclusion is made clear when one considers that the direct and independent knowledge possessed by Stone could have been omitted entirely at trial without affecting the outcome of the Count One FCA claims.

Because I conclude that Stone cannot qualify as an "original source" with respect to the successful Count One FCA claims, I would reverse the judgment of the district court and remand the case with directions to dismiss Stone's portion of the Count One FCA claims for lack of subject matter jurisdiction.